**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| REMARKABLE HEALTHCARE OF | § | CASE NOS. 24-40612 & 24-40611 |
| SEGUIN LP AND REMARKABLE | § | |
| HEALTHCARE LLC,[1] | § | (Jointly Administered) |
| | § | |
| | § | (Formerly Jointly Administered |
| DEBTORS. | § | under Lead Case: Remarkable |
| | § | Healthcare of Carrollton, LP, et al., |
| | § | 24-40605) |

## NOTICE OF FILING AMENDED PLAN SUPPLEMENT

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby submit this amended supplement (the "**Amended Plan Supplement**") to the *Third Amended Joint Subchapter V Plan of Reorganization for Remarkable Healthcare of Seguin LP and Remarkable Healthcare, LLC* [Dkt. No. 172] (as may be amended, modified or further supplemented, and including all exhibits thereto, the "**Plan**").[2]

**PLEASE TAKE FURTHER NOTICE** that as set forth in section XI.B of the Plan, the following additional documents are incorporated into and are part of the Plan as through fully set forth therein:

1. a non-exhaustive list of reserved Causes of Action, as provided by section VII.H of the Plan, attached hereto as **Exhibit A**;

2. Exit Credit Agreement, attached hereto as **Exhibit B**; and

3. Schedule of Rejected Executory Contracts and Unexpired Leases, attached hereto as **Exhibit C**.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Remarkable Healthcare of Seguin, LP (4566), and Remarkable Healthcare, LLC (5142).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**PLEASE TAKE FURTHER NOTICE** that as contemplated in the Plan, the Debtors reserve the right to amend the Plan Supplement through the Effective Date.

Dated: January 6, 2025
Dallas, Texas

**GUTNICKI LLP**

/s/ Liz Boydston
Liz Boydston (SBN 24053684)
Alexandria Rahn (SBN 24110246)
8080 N. Central Expy., Suite 1700
Dallas, Texas 75206
Telephone: (469) 935-6699
Facsimile: (469) 895-4413
lboydston@gutnicki.com
arahn@gutnicki.com

-and-

Max Schlan (admitted *Pro Hac Vice*)
45 Rockefeller Plaza
Suite 2000
New York, New York 10111
Telephone: (646) 825-2330
Facsimile: (646) 825-2330
mschlan@gutnicki.com

*Counsel to Debtors and Debtors-in-Possession*

**Exhibit A**

**Reserved Causes of Action**

# SCHEDULE OF RESERVED CLAIMS AND CAUSES OF ACTION

Pursuant to section VIII.H of the *Amended Joint Subchapter V Plan of Reorganization for Remarkable Healthcare of Seguin LP and Remarkable Healthcare, LLC* [Docket No. 38] (as may be amended, modified or further supplemented, and including all exhibits thereto, the "Plan"),[3] the Debtors submit the following non-exclusive schedule of Causes of Action reserved under the Plan ("Reserved Causes of Action"):

1. Preference, fraudulent transfer, and other Avoidance Actions pursuant to Chapter 5 of the Bankruptcy Code and state law counterparts;

2. State and common law claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty;

3. Claims for breach of contract;

4. Indemnification claims;

5. Commercial tort claims not otherwise listed;

6. Claims, causes of action, or rights against contractors, subcontractors, vendors, suppliers, and others with whom Debtors dealt in the ordinary course of their businesses;

7. Any and all Causes of Action necessary for the collection of accounts receivable from Medicare, Medicaid, any private insurers, or individuals, their families, representatives and assigns who have taken responsibility for amounts owed; and

8. All other rights, privileges, claims, actions, or remedies of the Debtors existing on the Effective Date, whether arising at law or in equity.

The Reserved Causes of Action exclude those claims covered by the Debtor Release, and any other claims or Causes of Action to the extent expressly released pursuant to the confirmed Plan or exculpated under section VIII.D of the Plan.

The Reserved Causes of Action may be asserted against (1) any party in interest identified in the Debtors' respective Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Debtors' Chapter 11 Cases, and (2) any entity to whom the Debtors incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings given in the Plan.

Any Entity to whom the Debtors incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who received services from the Debtors or a transfer of money or property of the Debtors, or who transacted business with the Debtors, or who leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Reorganized Debtors subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors have objected to any such Entity's proof of Claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors as disputed, contingent or unliquidated.

In addition to the possible causes of action and claims listed above, the Debtors have or may have, in the ordinary course of their businesses, claims and causes of action or rights against contractors, subcontractors, vendors, suppliers, and others with whom they deal in the ordinary course of their business (the "Ordinary Course Claims"). All rights to enforce, sue on, settle, or compromise such Ordinary Course Claims policies are expressly reserved and retained.

**Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order) of the Bankruptcy Court, the Debtors and their Estates expressly reserve such Cause of Action for later adjudication or administration by the Reorganized Debtors (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors or the Committee at this time or facts or circumstances which may change or be different from those the Debtors or the Committee now believe to exist).** No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date the Plan or Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order). No Person may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Cause of Action against it as any indication that the Debtors or Reorganized Debtors will not pursue any and all available Causes of Action against such Person or Entity, except as otherwise provided in the Plan. In addition, the Debtors and their Estates expressly reserve the right of the Reorganized Debtors to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuit.

Document    Page 6 of 18

**Exhibit B**

**Exit Credit Agreement**

**Renew Partners, LLC**
**Term Loan Agreement**

January 2, 2025

Laurie Beth McPike, President & CEO
Jon McPike, Chief Operating Officer
Remarkable Healthcare
P.O. Box 164966
Fort Worth, TX 76161-4966

Dear Mr. and Mrs. McPike:

We are pleased to advise you that Renew Partners, LLC (or one of its affiliates), is committed to establishing a $3,000,000 term loan (the "Term Loan") under the terms and conditions set forth below with Remarkable Healthcare of Seguin, LP and Remarkable Healthcare, LLC ("Borrower") to provide for Borrower's Chapter 11 Administrative Claims and ongoing working capital requirements. Any funding under this agreement is conditional on each of the terms within the agreement being met by both parties.

| | |
|---|---|
| <u>Borrower</u>: | Remarkable Healthcare of Seguin, LP<br>Remarkable Healthcare, LLC |
| <u>Administrative Agent</u>: | Rudy Renda |
| <u>Lenders</u>: | Renew Partners, LLC (or one of its affiliates) |
| <u>Facility</u>: | A $3,000,000 Term Loan Facility. |
| <u>Term Loan Availability</u>: | Lender is committed to make funds available by February 28, 2025, for use by the borrower per the terms of this agreement. Funds will be wired as directed by the borrower. |
| <u>Collateral</u>: | All Accounts Receivables beginning March 20, 2024, forward, with the exception of July 2024 Medicaid until West Wharton is reimbursed for an extended Line of Credit, and all future Accounts Receivables generated in the course of normal business. |
| <u>Term</u>: | 60 months |
| <u>Interest</u>: | Interest on the outstanding balance shall be payable monthly. The interest rate shall be set at 17%. Interest on the outstanding balance shall be calculated on the basis of the actual number of days elapsed in a 360-day year. Collections of cash by Lenders under the Term Loan shall be credited three business clearance days. |

1

Please initial upon approval 

| | |
|---|---|
| Loan Repayment: | Borrower will pay back the loan over the course of 60 months. Interest only will be paid at months one through twelve (1-12). Interest and principal payments will be paid months 13-59, as agreed upon in the AM schedule. The final payment will be a balloon payment at the end of the 60-month term. That amount may be paid or refinanced. |
| Fees: | Borrower shall pay Lenders an unused line fee 0.022% per month of the average unused portion of the Term Loan. |
| | Borrower shall pay Lenders a fully earned, non-refundable origination fee of 1.5% of the commitment amount, due and payable in full upon the funding of the initial loans under the Facility. |
| Term Loan Prepayment: | If the Facility is prepaid prior to the end of the Term, Borrower shall pay to Lenders a fee as compensation for the costs of being prepared to make funds available to Borrower throughout the Term equal to an amount determined by multiplying the Term Loan commitment amount by 1.5% which shall be reduced to 1% at the start of year three. |
| Security: | Lenders shall receive a perfected first priority security interest in all of Borrower's existing and future accounts receivable and accounts receivable-related items (Post March 20, 2024), all securities evidencing ownership interest in Borrower. Borrower shall maintain and pay for bank control accounts for Borrower's accounts receivables. |
| Financial Covenants: | Borrower will be required to maintain a minimum fixed charge coverage ratio and other ratios to be agreed upon by Borrower and Lender. |
| Loan Documents: | Borrower shall execute and deliver to Administrative Agent required loan and security agreements, instruments, documents, certificates, opinions and assurances as are reasonable and customary for similar loans, and as Administrative Agent may reasonably require in connection with the closing of the Facility. |
| | Administrative Agent shall receive an opinion from Borrower's counsel satisfactory to Administrative Agent. |
| Facility Costs: | All reasonable costs associated with the Facility, including, but not limited to Administrative Agent's out-of-pocket expenses associated with the transaction, professional fees, recording fees, search fees, software interface fees and filing fees will be paid by Borrower. |

2

Please initial upon approval _____

Borrower Covenants:

1) Borrower shall provide to Lender, or cause to be provided to Lender, the following:
   a) Annual compiled financial statements of borrower within 120 days of each borrower's fiscal year end;
   b) Monthly Borrower prepared financial statements within 45 days of each month end, certified by an Authorized Officer of the Borrower;
   c) Copies of Federal Income Tax returns within 15 days of filing each year;
   d) Annual Personal Financial Statements of Jon McPike and Laurie Beth McPike on an accrual basis dated as of December 31, and delivered within 365 days of such date;
   e) Copies of personal Income Tax returns of Jon McPike and Laurie Beth McPike within 15 days of filing each year;
   f) Accounts Receivable Aging of Remarkable Healthcare of Seguin within 30 days of month end;
   g) Annual report of facility occupancy statistics at each fiscal year end, within 120 days of Remarkable Healthcare of Seguin's fiscal year end;
   h) Annual verification of current license to operate within 120 days of Remarkable Healthcare of Seguin's fiscal year end;
   i) Such other information concerning Borrower and/or any Guarantor as lender reasonably requests.

2) As long as Lender shall have any commitment or obligation, if any, to make or extend any loans to or in factor of Borrower, and/or so long as any Liabilities remain unpaid and outstanding, Borrower covenants and agrees it shall:
   a) Borrower shall always maintain a Debt Service Coverage Ratio of not less than 1.00. For purposes of this agreement, the Debt Service Coverage Ratio shall be calculated annually as of the end of each fiscal year of Borrower, commencing with the fiscal year ending as of December 31, 2025, and the relevant period of determination shall be the four (4) fiscal quarter period ending as of each such date of calculation;
   b) Keep in full force and effect its own corporate, company or partnership existence in good standing; and continue to conduct and operate its business substantially as presently conducted and operated and maintain and protect all franchises and trade names and preserve the remainder of its property used or useful in the conduct of its business and keep in the same good repair and condition.
   c) Promptly inform Lender of occurrence of any event of default, or any condition or event which, with the giving of notice or passage of time, or both, would constitute an event of default under any of the Terms of the Loan, or any Material Adverse Effect in Borrower's business, properties, prospects, or financial condition.

3) So long as Lender shall have any commitment or obligation, if any, to make or extend any loans to or in favor of the Borrower, and/or so long as any Liabilities remain unpaid and outstanding, Borrower further agrees, that it shall not, without the prior written consent of the Lender:

Please initial upon approval 

2

a) Become or remain obligated for any Debt except the Liabilities, current unsecured trade, utility, or non-extraordinary accounts payable arising in the ordinary course of business;

b) Create, incur, assume, or suffer to exist any lien upon any of its property or assets, whether now owned or hereafter acquired, except for Permitted Encumbrances;

c) Make or allow to remain any investment in any loans, advances, or extensions of credit to any person;

d) Declare or pay dividends on, or make any other Distribution, if any default for event of default shall have occurred or be continuing or exist, or would arise, occur or exist after giving effect thereto;

e) Make loans, advances, or extensions of credit to any Person, except sales on open account in the ordinary course of business;

f) Change the name, location of its sole place of business, chief executive office/residence, business structure, corporate identity or structure, form of organization of the state in which it has been formed or organized; dissolve, liquidate, merge or consolidate with or into any other corporation, entity, or other business organization, or permit another corporation, entity or other business organization to merge into it without written Lender consent;

g) Guarantee or otherwise, directly or indirectly, in any way be or become responsible for obligations of any other Person, except guaranties in favor of the Lender, and the endorsement of negotiable instruments in the ordinary course of business for deposit or collection.

Terms:

4) The following terms, if used in this Agreement, shall have the meanings set forth below;

a) **Affiliate** or **Affiliates** shall mean, when used with respect to any Person, which, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such Person. For purposes of this definition "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), with respect to any Person, shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership, contract, or otherwise;

b) **Affiliate Receivables** shall mean, as of any time of determination, any amounts (whether in respect of loans or advances, accounts receivable, notes receivable, or otherwise) owing to Borrower or another Loan Party from any of its subsidiaries or Affiliates at such time;

c) **Authorized Officer** shall mean the chief executive or chief operating officer, or in his/her absence, another responsible senior officer, of Borrower or any other Loan Party as applicable;

d) **Capital Expenditure** shall mean any expenditure by a person for an asset which will be used in a year or years subsequent to the year in


Please initial upon approval

3

which the expenditure is made and which asset is properly classified in relevant financial statements of such Person as equipment, real property, a fixed asset, or similar typer of capitalized asset on the basis of GAAP, or an asset relating to or acquired in connection with an acquired business, and any and all acquisition costs related to above;

e) **Collateral** shall mean all property, assets and rights in which a lien or other encumbrance in favor of or for the benefit of Lender is or has been granted

f) **Current Assets** shall mean all current assets of such Person at such time, as determined on the basis of GAAP;

g) **Current Liabilities** shall mean all liabilities that should be classified as current at such time on the basis of with GAAP, plus, to the extent not otherwise included, all liabilities to any Affiliate, including officers, directors, shareholders, subsidiaries and commonly held companies which does not constitute subordinated debt;

h) **Debt** shall mean total liabilities, as determined on the basis of GAAP, in the case of the Borrower, the term debt shall include, without limitation, the Liabilities;

i) **Debt Service Coverage Ratio** shall mean, in respect of any applicable Person, and in respect of any applicable period towards determination and as of any applicable date of determination, the ratio of 1) the Net Income of such Person for such period (after deduction for applicable income and other taxes of such person determined by reference to income or profits of such persons) plus 2) to the extent deducted in the computation of such Net Income, the amount of depreciation and amortization expense and interest expense of such Person for such period, minus 3) the aggregate amount of Distributions, including without limit, Tax Distributions, made by such Persons during such period, to the sum of 1) the Current Maturities of Long Term Indebtedness of such Person at such time of determination, plus 2) the interest expense of such Person for such period;

j) **Current Maturities of Long-Term Indebtedness** shall mean, in respect of any applicable Person and as of any applicable date of determination thereof, that portion of the Long Term indebtedness of such Person that should be classified as a current liability at such time on the basis of GAAP, including, without limitation, that portion of capital lease obligations of such Person that would be so classified at such time;

k) **Distributions** shall mean, in respect of any applicable Person, dividends on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition of any Equity interest of such Person or of any warrants, options, or other rights to acquire the same;

l) **GAAP** shall mean generally accepted accounting principles consistently applied;

m) **Guarantor** shall mean any Person (other than borrower) who shall at any time, guarantee or otherwise be or become obligated for the repayment of all or any part of the Liabilities;

4

Please initial upon approval 

n) **Lien** shall mean any mortgage, pledge, encumbrance, security interest, assignment, lien or charge or other interest or any kind upon any property or assets, whether real, personal or mixed, to secure any indebtedness, obligation or liability owed to or claimed by any Person, other than the owner of such property or assets, whether arising under or based upon contract, law or otherwise;

o) **Long Term Indebtedness** shall mean all debt of such person which should be classified as funded indebtedness or long-term indebtedness on a balance sheet;

p) **Material Adverse Effect** shall mean any act, event, condition, or circumstance which could materially and adversely affect the business, operations, condition, performance, prospects, or assets of any Loan Party, the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party or by which it is bound or the enforceability of any Loan Document, or any Loan Party's interest in, or the value, perfection or priority of Lender's security interest in the collateral;

q) **Net Income** shall mean the net income (or loss) for such period, as determined on the basis of GAAP, but excluding, in any event:

1. Any gains or losses on the sale or other disposition, not in the ordinary course of business, of investments or fixed or capital assets, and any taxes on the excluded gains and any tax deductions or credits on account of any excluded losses; and

2. Net earnings of any other Person in which the applicable Person has an ownership interest, unless such net earnings shall have actually been received by the applicable entity in the form of cash distributions.

r) **Person** shall mean any individual, corporation, partnership, joint venture, limited liability company, association, trust, unincorporated association, joint stock company, government, municipality, political subdivision or agency

s) **Subordinated Debt** shall mean any debt of borrower which has been subordinated to the Liabilities pursuant to a subordination agreement in form and content satisfactory to Lender

5) This agreement Shall be governed by and construed and enforced with the law of the State of Texas;

6) Oral Agreements Ineffective. This agreement and any other loan agreements (as defined in Section 26.02(A)(2) of the Texas Business and Commerce Code, as amended) represent the final agreement between the parties, and this agreement and other written loan agreements may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements between the parties. There are no unwritten oral agreements between the parties.

5

Please initial upon approval 

| | |
|---|---|
| Security Agreement: | For value received, the undersigned Borrower pledges, assigns, and grants to Lender, a continuing security interest and lien in the Collateral (as defined below) to secure payment when due, whether by stated maturity, demand, acceleration, or otherwise, of all existing and future indebtedness of Remarkable Healthcare of Seguin, LP. Indebtedness shall mean any and all indebtedness, obligations or liabilities of the Borrower to the Lender. |

Borrower further covenants, agrees, represents and warrants as follows:

a) **Collateral.** Collateral shall mean all of the following assets Borrower now or later owns or has an interest in, whenever located:

All accounts receivable beginning March 20, 2024, forward and into the future, contract rights, deposit accounts, documents, promissory notes, and rights to payment evidenced by chattel paper, documents or instruments, health care insurance receivables, commercial tort claims, letters of credit, letter of credit rights, supporting obligations, money and rights to payment for money or funds advanced or sold.

b) **Warranties, Covenants and Agreements.** Borrower warrants, covenants and agrees as follows:

   i) Borrower shall furnish to Lender, in form and at intervals as requested, any information lender may reasonably request and allow Lender to examine, inspect, and copy any of Borrower's books and records. Borrower shall, at the request of the Lender, mark its records and the Collateral to clearly indicate the security interest of the Lender under this agreement.

   ii) At any time any Collateral becomes, or is represented to be, subject to a security interest in favor of Lender, Borrower shall be deemed to have warranted that: 1. Debtor is the lawful owner of the Collateral and has the right and authority to subject it to a security interest granted to Lender; 2. None of the Collateral is subject to any security interest other than that in favor of the Lender, 3. There are no financing statements on file in respect of any of the Collateral other than in favor of the Lender, 4. No person, other than the lender, has possession or control of any Collateral of such nature that perfection of security interest may be accomplished by control, and 5. Borrower acquired its rights in the Collateral in the ordinary course of business.

   iii) On each occasion on which Borrower evidences to Lender the account balances on and the nature and extent of the Accounts Receivable, Borrower shall be deemed to have warranted that, except as otherwise indicated, a) each of those Accounts Receivable is valid and enforceable without performance by the Borrower, b) each of those account balances are in fact owing; c) there are not setoffs, recoupments, credits, contra accounts, counterclaims or defenses against any of those Accounts Receivable; d) as to any Accounts Receivable represented by a note, trade acceptance, draft or other instrument or by chattel paper or document, the same has been endorsed and or delivered by Borrower to the Lender; e) Borrower has not received with respect

Please initial upon approval 

6

to any Account Receivable, any notice of the death of the related account debtor, nor of dissolution, liquidation, termination of existence, insolvency, business failure, appointment of a receiver for, assignment of the benefit to the creditors by or filing of a petition in bankruptcy; f) as to each Account Receivable, except as may be expressly permitted by Lender to the contrary in another document, the account debtor is not an affiliate of the Lender or citizen of any jurisdiction outside of the United States. Borrower will do all acts and execute all writings requested by Lender to perform, enforce, performance of, and collect all Accounts Receivable as Lender may reasonably request. Borrower agrees to deliver to Lender any documents evidencing or related to the Accounts Receivable as Lender may reasonably request from time to time.

iv) Borrower at all times shall be in compliance with all applicable laws, including laws, ordinances, directives, orders, statutes, or regulations applicable.

v) Borrower delivers this Agreement based on Borrower's independent investigation of or decision not to investigate, the financial condition of Borrower and is not relying on any information furnished by the Lender. Borrower assumes full responsibility for obtaining any further information concerning the Borrower's financial condition.

c) **Defaults, Enforcement, and Application of Proceeds**.

i) The occurrence or existence of any of the following conditions or events shall constitute an Event of Default under this Agreement;

(1) Any failure to pay the indebtedness or any other indebtedness when due, or such portion of it as may be due by acceleration or otherwise; or

(2) Any failure or neglect to comply with, or breach of or default under, any term or provision of this Agreement; or any failure or neglect to comply with, or breach of or default under, any term or provision of any other agreement; or commitment between Borrower and Lender, and any such failure, neglect, or breach or default continues beyond any applicable grace or cure period expressly provided with respect thereto; or

(3) Any warranty, representation, financial statement, or other information made, given or furnished to Lender by Borrower shall be, or shall prove to have been, false or materially misleading when made, given, or furnished; or

(4) Lender deems the margin of Collateral insufficient or insecure, in good faith believing that the prospect of payment or performance of the indebtedness or performance of this Agreement is impaired to shall fear deterioration, removal, or waste of collateral; or

(5) Any default or event of default shall occur under any instrument, agreement or other document evidencing securing or otherwise relating to any of the indebtedness.

7

Please initial upon approval 

    ii) Upon the occurrence and at any time during the continuance or existence of any Event of Default, Lender may at its discretion and with prior notice to Borrower, declare any or all of the indebtedness to be immediately cured within a 60-day period, due and payable, and shall have and may exercise any right or remedy available to it including, without limitation, any one or more of the following remedies:

        (1) Exercise all the rights and remedies upon default in foreclosure and otherwise, available to secured parties under provisions of the Uniform Commercial Code and other applicable law;

        (2) Institute legal proceedings to foreclose upon the lien and security interest granted by this Agreement, to recover judgment for all amounts then due and owing as indebtedness and to collect the same out of any Collateral or the proceeds of any sale of it;

        (3) Institute legal proceedings for the sale under the judgment or decree of any court of competent jurisdiction of any or all Collateral.

**Guaranty:** The Borrower, for value received, unconditionally and absolutely guarantees to Lender payment when due, whether by stated maturity, demand, acceleration or otherwise, of all existing and future indebtedness.

    a) **Limitation**: The total obligation of the Borrower under this Guaranty is unlimited unless specifically limited in the provisions of this Agreement. This obligation shall include, in addition to any limited amount of principal guaranteed, all interest on all indebtedness.

    b) **Nature of Guaranty**: This is a continuing Guaranty of payment and not of collection and remains effective until the indebtedness is entirely extinguished.

    c) **Application of Payments**: The borrower authorizes lender to 1) apply any security and direct the order or manner of sale of it; 2) release or substitute any one or more of the endorsers or any other guarantors of the indebtedness; and 3) apply payments received by the Borrower to any indebtedness of the Borrower to the Lender, in such order as the Lender shall determine in its sole discretion.

    d) **Guarantors**: Remarkable Healthcare of Seguin LP and Remarkable Healthcare, LLC shall be the guarantors.

    e) **Termination**: The guaranty shall remain in place until the indebtedness is paid in full.

    f) **Reinstatement**: The effectiveness of the Guaranty, and all liens and security interests, shall automatically continue or be reinstated in the event that any payment received is returned, disgorged, or rescinded.

8

Please initial upon approval 

This agreement does contain all of the terms, conditions, representations and warranties, covenants and other provisions for the Facility. The Facility shall be subject to terms, covenants and conditions as Administrative Agent deems appropriate in its sole discretion.

This agreement is being delivered in reliance that all information provided to Lenders is and will be accurate and complete.

Notwithstanding anything else contained herein, Borrower hereby expressly agrees to be bound by the provisions of this agreement relating to confidentiality, exclusivity and expense reimbursement if all conditions of the agreement are met by both parties

Lender. hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act") and Lender's policies and practices, Lender is required to obtain, verify and record certain information and documentation that identifies each Borrower, which information includes the name and address of each Borrower and such other information that will allow Lender to identify each Borrower in accordance with the Act.

Please initial upon approval 

9

The undersigned, being all of the general partners of/or the partner or partners required to bind the partnership named below, acknowledge, confirm and certify to Lender that:

1. Remarkable Healthcare of Seguin, LP is a Texas Limited Partnership (The Partnership)
2. The Partnership is financially interested in the affairs of Remarkable Healthcare, LLC, a Texas Limited Liability Company
3. There has been presented to the Partnership certain documents and instruments including but not limited to the following:
   a. Loan Agreement Document (referred to as the agreement) as yet unexecuted, in favor of the lender, pertaining to the existing or future indebtedness of the Borrower to the Lender.
4. In order to induce the Lender to extend credit or other financial accommodations to the Borrower, the Partnership deems it advisable, desirable, and in the best interests of the Partnership and its partners that the Partnership enter into the Agreement.

Authorized Partners

_____
Remarkable Healthcare of Seguin, LP

By: _____

Name: Jon McPike

Title: Chief Operating Officer


Authorized Partners

_____
Renew Partners

By: _____

Name: Rudy Renda

Title: General Manager


Please initial upon approval _____

10

**Exhibit C**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

**None**