**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CHAPTER 11** |
| | § | |
| **REMARKABLE HEALTHCARE OF** | § | **CASE NOS. 24-40611 & 24-40612** |
| **SEGUIN, LP AND REMARKABLE** | § | |
| **HEALTHCARE, LLC,**[1] | § | |
| | § | |
| **DEBTORS.** | § | |

**DEBTORS' OBJECTION TO CLAIM NO. 15-1 FILED BY KRS SEGUIN LLC**

**30-DAY NEGATIVE NOTICE – LBR 3007(b):**

**ATTENTION: YOUR CLAIM MAY BE REDUCED, MODIFIED, OR ELIMINATED. Accordingly, you should read this pleading carefully and discuss it with your attorney, if you have one in this bankruptcy case. If you do not wish for the Court to eliminate or change your claim, you must file a written response opposing the claim objection, explaining the factual and/or legal basis for that response.**

**No hearing will be conducted on this claim objection unless a written response in opposition is filed with the Clerk of the United States Bankruptcy Court and served upon the party filing this pleading WITHIN THIRTY (30) DAYS FROM THE DATE OF SERVICE listed in the certificate of service unless the Court shortens or extends the time for filing such response. If no response in opposition is timely served and filed, this claim objection shall be deemed to be unopposed, and the Court may enter an order sustaining the objection to your claim. If a response in opposition is filed and served in a timely manner, the Court will thereafter set a hearing with appropriate notice. If you fail to appear at the hearing, your response in opposition may be stricken. The Court reserves the right to set a hearing on any matter.**

The above-captioned debtors and debtors in possession Remarkable Healthcare of Seguin,

LP ("**RH Seguin**") and Remarkable Healthcare, LLC ("**RH LLC**") (collectively, the "**Debtors**")

hereby file this objection (this "**Objection**") to Claim No. 15-1 in Case Number 24-40612 filed by

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Remarkable Healthcare of Seguin, LP (4566) and Remarkable Healthcare, LLC (5142).

KRS Seguin, LLC seeking $3,625,604.53 ("**KRS's Second Claim**"). In support of the Objection, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     The Debtors object to KRS's Second Claim, Claim No. 15-1 (attached hereto as **Exhibit B**) for the following reasons:

2.     *First*, KRS's Second Claim inappropriately includes post-petition rent and post-petition late fees and incorrectly argues that the amount necessary to cure the Seguin Lease (the "**Seguin Cure Amount**") includes the full pre- and post-petition amounts of all four Remarkable Leases (not only of Debtor RH Seguin, but also of the DFW Debtors) due to cross-default provisions in the Leases. These provisions are inapplicable in bankruptcy cases, and as detailed herein, the Seguin Cure Amount does not include any amounts related to the DFW Debtors' Leases.

3.     *Second*, KRS also incorrectly argues that the Seguin Cure Amount includes the Former Landlord's Claim amount[2] to cure the Debtors' Lease (defined below) on the Seguin facility (the "**Seguin Lease**"), which is based on an <u>un</u>secured promissory note that was <u>un</u>purchased by KRS Seguin, <u>un</u>assumed by KRS Seguin, and <u>un</u>assigned to KRS Seguin. The unsecured promissory note is not part of the Seguin Lease and is not required to be cured for the Debtors to assume the Seguin Lease, nor is it entitled to any special secured or administrative designation in these cases.

---

[2] Claim No. 14-2 in Case Number 24-40612 of Mustang NH, LLC, GMP Dallas NH, LLC, WAG Development, Ltd. and Guadalupe NH Development, Ltd. (altogether, the "**Former Landlord,**") seeking $995,867.80.

4.      *Third*, to the extent that KRS's Second Claim encompasses or is duplicative of any amounts owed to the Former Landlord and reflected in the Former Landlord's Claim or to KRS's First Claim,[3] Debtors object.

5.      *Fourth,* if the Court grants KRS's Second Claim, such Claim must be set off against Debtors' claims against KRS.

6.      *Last*, if this Court allows KRS's Second Claim, the claim must be capped in accordance with the statutory limit set forth under 11 U.S.C. § 502(b)(6).

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). The Debtors consent to entry of a final order under Article III of the United States Constitution.

8.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

9.      The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105(a) and 502 and Bankruptcy Rule 3007.

## BACKGROUND

**A. GENERAL BACKGROUND**

10.     On March 20, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief and electing treatment under subchapter V of chapter 11 of the Bankruptcy Code (the "**Cases**").

11.     On March 26, 2024, the Office of the United States Trustee for the Eastern District of Texas appointed a Subchapter V trustee in the Cases (the "**Subchapter V Trustee**").

---

[3] **KRS's First Claim** is Claim No. 5-1 in Case Number 24-40612 filed by KRS Carrollton LLC, KRS Dallas LLC, KRS Fort Worth LLC, KRS Seguin LLC (altogether, "**KRS**" or the "**KRS Landlord**") seeking $3,149,911.71. KRS's First Claim and KRS's Second Claim are collectively referred to here as "**KRS's Claims**."

12.     On March 27, 2024, the Court entered an order directing joint administration of the Debtors' and the DFW Debtors' cases under case no. 24-40605. *See* Case No. 24-40605, Dkt. 36.

13.     On April 26, 2024, RH Fort Worth ceased operations, and the last resident relocated. The Fort Worth Lease was rejected on April 19, 2024, and RH Fort Worth turned over the property to the KRS Landlord.

14.     On May 13, 2024, the operations for RH Carrollton and RH Dallas transitioned to new management, controlled by the KRS Landlord, pursuant to the terms of the Amended Show Cause Order entered on May 10, 2024, and as amended May 14, 2024. *See* Case No. 24-40605, Dkts. 105 and 106.

15.     On October 10, 2024, the Court entered the *Order Granting the DFW Debtors' Emergency Motion to Convert Chapter 11 Cases to Chapter 7* [Case No. 24-40605, Dkt. 423], converting the DFW Debtors' cases to chapter 7. Contemporaneously therewith, the Court amended the *Order Directing Joint Administration of the Cases* to jointly administer RH Seguin's and RH LLC's cases under case number 24-40611. *Id.*

16.     On December 18, 2024, this Court dismissed the DFW Debtors' cases.

17.     Debtors RH Seguin and Remarkable Healthcare, LLC ("**RH LLC**") continue to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

**B.   THE LEASES**

18.     RH Seguin, RH Carrollton, RH Fort Worth, and RH Dallas separately entered into four (4) different leases with four (4) different landlords on four (4) different dates. RH LLC is not obligated under any lease.

19.     First, the Lease Agreement and Security Agreement by and between Guadalupe NH Development, Ltd and LBJM, L.L.C., dated July 8, 2010, was entered to lease the property with

the common street address 1339 Eastwood Drive, Seguin, Guadalupe County, Texas 78155 (the "**Seguin Lease**"), a true and correct copy is attached hereto as **Exhibit C**. The Seguin Lease was then assigned via an Assignment of Lease Agreement and Security Agreement, dated July 8, 2010, by and between LBJM, LLC (as the Assignor) and RH Seguin (as the Assignee).

20.     Second, the Lease Agreement and Security Agreement by and between WAG Development, Ltd. and Remarkable Healthcare of Fort Worth, LP, dated December 13, 2010, was entered to lease the property with the common address of 6649 North Riverside Drive, Fort Worth, Tarrant County, Texas 76137 (the "**Fort Worth Lease**"), a true and correct copy is attached is attached hereto as **Exhibit D**.

21.     Third, the Lease Agreement and Security Agreement by and between GMP Dallas NH, Ltd. and Remarkable Healthcare of Dallas, LP, dated March 9, 2012, was entered to lease the property with the common address of 3350 Bonnie View Road, Dallas County, Texas 75216 (the "**Dallas Lease**"), a true and correct copy is attached hereto as **Exhibit E**.

22.     Fourth, the Lease Agreement and Security Agreement by and between Mustang NH, LLC and Remarkable Healthcare of Carrollton, LP, dated March 13, 2013, was entered to lease the property with the common address of 4501 Plano Pkwy., Carrollton, Denton County, TX 75010 (the "**Carrollton Lease**"), a true and correct copy is attached hereto as **Exhibit F**.

23.     The Fort Worth Lease, the Dallas Lease, and the Carrollton Lease are collectively referred to herein as the "**DFW Debtors' Leases**."

**C. THE 2018 BANKRUPTCY GRIFFIN NOTE AND THE 2022 ASSIGNMENT OF THE LEASES WITHOUT THE GRIFFIN NOTE.**

24.     On February 12, 2018, Debtors and the DFW Debtors each filed voluntary petitions for relief, jointly administered under Case No. 18-40295 (the "**2018 Bankruptcy Cases**"). The Court confirmed that plan on May 16, 2019, and the cases were closed on April 4, 2020.

25.     In the 2018 Bankruptcy Cases, the confirmed plan included an agreement in the form of an unsecured Promissory Note executed May 10, 2019, and effective May 31, 2019, to cure (the "**Griffin Note**") the Seguin Lease, the Fort Worth Lease, the Carrollton Lease, and the Dallas Lease (altogether, the "**Leases**"). *See* Former Landlord's Claim, p.6-8 of 29.

26.     On November 21, 2022, despite amounts remaining outstanding under the Griffin Note, the Former Landlord assigned the Leases to KRS Seguin, KRS Fort Worth LLC, KRS Dallas LLC, and KRS Carrollton LLC, respectively. *See, e.g.,* Assumption and Assignment of Lease for Seguin facility, a true and correct copy is attached hereto as **Exhibit G**.[4]

27.     On August 9, 2024, KRS's principal Josh Kilgore testified under oath at a hearing on KRS's Motion for Relief from the Automatic Stay, that the manager of the Former Landlord, Mr. Rick Griffin, retained the Griffin Note. *See* Transcript of Hearing (Aug. 9, 2024) at 176:7–16, a true and correct copy of the transcript excerpt is attached hereto as **Exhibit H**; *see also* Letter Re: Notice of amounts due (Nov. 30, 2022), a true and correct copy is attached hereto as **Exhibit I** (the "**Notice Letter**") (stating, "nor did the Current Landlords purchase the promissory note referred to therein").

---

[4] The Assumption and Assignment of Lease agreements for the other three facilities are materially identical to the Assumption and Assignment of the Seguin facility lease, except that the names of the relevant entities and addresses are modified accordingly to match the Leases.

### D. BAR DATE

28.     On March 27, 2024, the Court entered a Notice of Chapter 11 Bankruptcy Case (the "**Notice**," Dkt. 15) fixing the general proof of claim deadline for May 29, 2024 (the "**General Bar Date**"). Notice of the General Bar Date was provided by mail and publication. To date, approximately 124[5] proofs of claim (collectively, the "**Proofs of Claim**") have been filed asserting claims against Remarkable (collectively, the "**Claims**"). Approximately 35 of the 124 total Claims filed were filed against either RH Seguin or RH LLC.

29.     In the ordinary course of business, the Debtors maintain books and records (the "**Books and Records**") that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors.

30.     The Debtors' claims agent, Omni Agent Solutions (the "**Claims Agent**"), has prepared and maintains a register of Proofs of Claim that were filed in these Cases asserting Claims against the Debtors. The Debtors and their advisors are comprehensively reviewing and reconciling all Claims, including both the Claims listed on the Schedules (the "**Scheduled Claims**") and the Claims asserted in the Proofs of Claim (including any supporting documentation) filed in these Cases. The Debtors also are comparing the Claims asserted in the Proofs of Claims with their Books and Records to determine the validity of the asserted Claims.

### E. KRS'S MULTIPLE PROOFS OF CLAIM

31.     On April 24, 2024, KRS filed **KRS's First Claim** against RH Seguin for $3,149,911.71. KRS's First Claim's amount is based on the alleged past-due amounts owed by RH

---

[5] The approximate number of proofs of claim filed for each debtor is: Remarkable Healthcare of Carrollton—36; Remarkable Healthcare of Dallas—28; Remarkable Healthcare of Fort Worth—25; Remarkable Healthcare of Seguin—25; and Remarkable Healthcare, LLC—10.

Seguin *and* the DFW Debtors collectively through March 1, 2024. A breakdown of the amounts

alleged due is as follows:

| KRS Carrollton LLC | $934,604.13 |
| KRS Dallas LLC | $807,101.44 |
| KRS Fort Worth LLC | $834,512.73 |
| KRS Seguin LLC | $573,693.41 |
| **Total** | **$3,149,911.71** |

32.     On or about May 29, 2024, KRS filed **KRS's Second Claim** (rather than amending

KRS's First Claim) in RH Seguin's case for $3,625,604.53 based on the amounts owed on all the

Leases as of April 22, 2024 (despite the Petition Date being March 20, 2024). *See* **Exhibit B**. In

KRS's Second Claim, KRS alleges that RH Seguin owes the past due amounts of all four Leases

on account of cross-default provisions. KRS's Second Claim also includes post-petition rent and

post-petition late fees due for April 2024 (the Petition Date was March 20, 2024) for all four

Leases, as well as post-petition late fees ranging from approximately $4,000-$5,000 per Lease per

month. *Id.*

### F.  COUNSEL TO KRS AND THE FORMER LANDLORD HAS A CONFLICT OF INTEREST

33.     KRS's counsel possesses a conflict of interest that precludes resolution of the

current Seguin cure amount (the "**Seguin Cure Amount**"). Jeffrey Carruth, counsel for KRS in

these Cases, is also counsel for the Former Landlord in these Cases and has filed Proofs of Claim

in these Cases for $995,867.80[6] on behalf of the Former Landlord. Despite KRS's testimony that

the Griffin Note was not assumed or assigned by KRS and despite efforts to resolve the Seguin

Cure Amount in order for the Debtors to assume the Seguin Lease and confirm their plan, Mr.

---

[6] It should be noted that paragraph 33 of the KRS Landlord's Motion states the original principal amount of the Griffin Note was $1,520,776.58, and paragraph 34 states that the outstanding balance on the Griffin Note as of the Petition Date is $995,867.80, but then states in paragraphs 36 and 37: "36. Neither RH-S [RH Seguin] nor any other of the operating Debtors has ever made any payments on the Griffin Note. 37. The full balance of the Griffin Note remains due and owing." These statements blatantly contradict the fact that the Griffin Note principal amount was $1,520,776.58.

Carruth has been unwilling to resolve the Seguin Cure Amount due to the unresolved claim of his conflicting client—the Former Landlord. Mr. Carruth asserts that satisfaction of the Griffin Note is a mandatory part of the Seguin Cure Amount (again, despite his client KRS's testimony that the Griffin Note was not assigned to or assumed by KRS). If the Debtors are able get full agreements with KRS on the Seguin Cure Amount and rent going forward, but neither KRS nor the Former Landlord will withdraw their objections relating to the Seguin Cure Amount, then it will be clear that counsel is conflicted and confirmation should not be held up to appease his conflicting client, the Former Landlord, at the great expense of the Estates.

34.    For the reasons set forth in more detail below and based on the review done by the Debtors and their representatives, counsel, and advisors, the Debtors have determined that the KRS's Second Claim is objectionable and should be disallowed.

## **RELIEF REQUESTED**

35.    By this Objection, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, (1) disallowing KRS's Second Claim, Claim No. 15-1, in its entirety until and unless KRS provides the necessary and supporting documentation to support its Proof of Claim; (2) disallowing part or all of KRS's Second Claim as being duplicative, containing improper set-off amounts, and/or improper calculations; or (3) in the alternative, following KRS's production of the necessary supporting evidence indicating the validity or non-duplicative basis for its claim, limiting the amount to the limits set by § 502(b)(6).

## BASIS FOR RELIEF REQUESTED

**A. KRS's Second Claim, Claim No. 15-1, is Not Supported by Adequate Documentation.**

36.     Bankruptcy Code section 502(a) provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). *See also* Fed. R. Bankr. P. 3001(f) (a properly executed and filed proof of claim constitutes "*prima facie* evidence of the validity and amount of the claim"); *In re O'Connor*, 153 F.3d 258 (5th Cir. 1998). However, "[i]t is elemental that a proof of claim must assert facts or allegations . . . which would entitle the claimant to a recovery." *In re Heritage Org., L.L.C.*, Case No. 04-35574 (BJH), 2006 WL 6508477, at *8 (Bankr. N.D. Tex. Jan. 27, 2006), *aff'd sub nom*, *Wilferth v. Faulkner*, Civ. No. 3:06-CV-510-K, 2006 WL 2913456 (N.D. Tex. Oct. 11, 2006). Failure to itemize interest in accordance with the rules means that the proof of claim is not *prima facie* evidence of the claim's validity and amount. *In re Sherman*, 639 B.R. 618, 622 (Bankr. N.M. 2022).

37.     A chapter 11 debtor has a duty to object to the allowance of any claim which is improper. *See* 11 U.S.C. §§ 704(a)(5), 1106(a)(1), and 1107(a). "[I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount." 11 U.S.C. § 502(b).

38.     When an objection relating to the claim's underlying sufficiency is asserted, the burden of proof shifts to the claimant, who must prove, by a preponderance of the evidence, the claim's validity. *In re Starnes*, 231 B.R. 903, 912 (N.D. Tex. 1998). *See also In re Armstrong*, 347 B.R. 581, 581 (Bankr. N.D. Tex. 2006) ("[T]he ultimate burden of proof always lies with the claimant."). Under Bankruptcy Code section 502(b)(1), a claim may not be allowed to the extent

"such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). *See, e.g.*, *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1110 (7th Cir. 2014) (determining that an unenforceable claim was disallowed).

39.     Here, KRS failed to provide sufficient evidence to support the validity of its Claim. KRS only claims that the supporting documentation has been "previously supplied to Debtor(s) and otherwise available upon request." It is unclear what documentation KRS refers to, and it is not the Debtors' responsibility to guess. The Debtors have made numerous requests of KRS for documents supporting KRS's many proofs of claim. Presuming the documentation KRS refers to are the lease agreements, the lease agreements alone are hardly sufficient to support KRS's alleged Claim. Although the Leases detail how the rent will increase over time, it is unclear how that increase has been calculated. Indeed, when the Former Landlord assigned the Leases to KRS, the amount of rent due each month for the Remarkable facilities cumulatively grew suddenly by 19%—an untenable amount. Further, it also appears that KRS's Claims have significant overlap, and it is not entirely clear why KRS did not amend the KRS's First Claim rather than file a completely new claim. At bottom, KRS's Second Claim must be stricken as duplicative and as improper for including post-petition rent for April 2024 when the Cases were filed on March 20, 2024.

40.     Further, due to the untenable increase in the rent when KRS took possession of the Leases, KRS negotiated a lower rent amount with the Debtors and offered to forgive $81,579.66 of the deficiency balance then owed by Remarkable. *See* KRS Production 008 – Pages 24-25, a true and correct copy is attached hereto as **Exhibit J**. Nevertheless, KRS's Second Claim does not account for this agreement.

41.     KRS may assert that since no official written document accounts for the discounted rent provided by the Former Landlord that it assumed or even later provided by KRS, it is not obligated to continue to allow the Debtors to pay that lower rent amount. The Debtors, however, request that this Court only require Debtors to pay the rent amount the parties previously negotiated. KRS may argue that the letter sent to Debtors upon the assignment of the Leases by the Former Landlord qualifies as adequate notice of the rental increase back to the rent calculation agreed upon within the Leases but, even with notice, such an increase makes the Leases unconscionable. *See* Ex. I, the Notice Letter. The Notice Letter further evidences that the Former Landlord had entered an official agreement with the Debtors reducing the rent and deferring the Griffin Note from the 2018 Bankruptcy Cases. Indeed, the Notice Letter states in relevant part:

> The Current Landlords [KRS] did not assume the Rent Reduction and Note Deferment Agreement, nor did the Current Landlords purchase the promissory note referred to therein.

*Id*. Thus, it violates all principles of equity and is unconscionable to force the Debtors to pay a higher rent after a reduced rental rate had already been negotiated and implemented by the Former Landlord.

42.     "Unconscionability is determined in light of a variety of factors, which aim to prevent oppression and unfair surprise; in general, a contract will be found unconscionable if it is grossly one-sided." *In re Poly-Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). Indeed, the Texas Supreme Court has explained: ". . . the basic test for unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that is unconscionable under the circumstances existing when the parties made the contract." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001). When determining unconscionability courts look at how the contract was formed and the terms of the contract. *Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 498-99 (Tex. 1991).

43.     Based on the way that licensing works with Medicare and Medicaid, when the Former Landlord requested the Debtors' consent to the assignment of the Leases to KRS, the Debtors had no other option but to agree to the assignment even if it meant that the rent reductions provided by the Former Landlord would no longer apply. Indeed, the Former Landlord built the properties specifically for Remarkable, and all of Remarkable's licensing was tied to that property. Plus, finding a new location and transferring the patients would have imposed an undue hardship on the Debtors. Thus, the Debtors had no other choice but to agree to the assignment of the Leases to KRS, even if it meant that the rent amount would increase to an untenable amount.

44.     Even if the assignment of the Leases to KRS did not render the Leases unconscionable, promissory estoppel precludes KRS from requiring the Debtors to pay the inflated rent amounts it asserts are supported by the Leases. Promissory estoppel involves: (1) a promise, (2) foreseeability of reliance on the promise by the promisor; and (3) substantial detrimental reliance by the promise. *See English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983). The Former Landlord promised the Debtors a reduced rent amount and he allowed the Debtors to pay a reduced rental amount for several months. It is justifiable and foreseeable that the Debtors, thus, would rely on that reduced rent amount going forward even upon the sale of the property and assignment of the Leases. Indeed, the reduced rent became the custom and course of dealing between the parties, so it is foreseeable that the Debtors would rely on a reduced rental rate even when KRS became the new landlord.

45.     KRS's Second Claim is unsupported by the necessary supporting documentation as required by Bankruptcy Rule 3001, fact, or the Debtors' books and records. Unless and until KRS provides a valid basis for its Claim, KRS's Second Claim should be disallowed in its entirety.

**B. THE SEGUIN CURE AMOUNT DEFINITIVELY EXCLUDES ANY AMOUNTS TIED TO THE DFW DEBTORS' LEASES BECAUSE THE LEASE CROSS-DEFAULT PROVISIONS ARE UNEQUIVOCALLY INAPPLICABLE.**

46.     In its filings, KRS incorrectly states that lease cross-default provisions are applicable in bankruptcy. *See* KRS Second Objection at par. 8-11; Case No. 24-40605, Dkts. 172, 263. KRS asserts that the unpaid rent under the Leases for the DFW Debtors (Carrollton, Dallas, and Fort Worth) through and including May 2024 rent for Dallas and Carrollton and through and including April 2024 rent for Fort Worth (despite the fact that the Petition Date was March 20, 2024) was in at least the amount of $3,202,092.21. Case No. 24-40605, Dkt. 263, ¶ 25. KRS further alleges that through July 1, 2024, the post-petition rent arrearage on the Seguin Lease alone is at least in the amount of $402,511.92 and that the total rent arrearage is at least $976,205.33. Case No. 24-40605, Dkt. 263, ¶27.

47.     Without affirming KRS's calculations regarding Seguin Lease, the cross-default provisions are inapplicable when assuming a lease during a bankruptcy, and the Debtors only owe for the amounts past due under the Seguin Lease. *See, e.g., Lifemark Hosps. Inc. v. Liljeberg Enters. Inc. (In re Liljeberg)*, 304 F.3d 410, 444–45 (5th Cir. 2002) (acknowledging authority from bankruptcy courts and district courts for the proposition that cross-default provisions do not integrate otherwise separate transactions or leases). Where a lease or contract "contains several different agreements, and the lease or contract can be severed under applicable non-bankruptcy law, section 365 allows assumption or rejection of the severable portions of the lease or contract." *In re FFP Operating Partners, L.P.*, 2004 Bankr. LEXIS 1192, *4–5, 2004 WL 3007079, *1 (Bankr. N. D. Tex. 2004) (citing *Stewart Title Guar. Co. v. Old Republic Nat'l Title*, 83 F.3d 735, 739 (5th Cir.1996)).

48.     In addressing the enforcement of cross-default provisions, one court explained:

> Federal bankruptcy policy is offended where the non-debtor party seeks enforcement of a cross-default provision in an effort to extract priority payments under an unrelated agreement. A creditor cannot use the protections afforded it by section 365(b) (which requires curing of defaults and adequate assurances of future payments as a precondition to assumption of an executory contract or unexpired lease) in order to maximize its returns by treating unrelated unsecured debt as a de facto priority obligation. Thus, where the non-debtor party would have been willing, absent the existence of the cross-defaulted agreement, to enter into a contract that the debtor wishes to assume, the cross-default provision should not be enforced. However, enforcement of a cross-default provision should not be refused where to do so would thwart the non-debtor party's bargain.

*See Kopel v. Campanile (In re Kopel)*, 232 B.R. 57, 65–66 (Bankr. E.D.N.Y. 1999). Thus, in bankruptcy, courts generally disregard cross-default provisions, because they are impermissible restrictions on assumption and assignment. *See, e.g., In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 772, 777–79 (Bankr M.D. Pa. 1985) (refusing to enforce cross-default provision which would interfere with debtor's ability to assume contract), *aff'd*, 67 B.R. 620 (W.D. Pa. 1986); *see also Sambo's Restaurant, Inc.*, 24 B.R. 755, 757–58 (Bankr. C.D. Cal. 1982) (finding that cross-default provisions operated to restrict debtor's ability to assume and assign contract).

49.    Moreover, it is well-established that cross-default provisions do not integrate executory contracts or unexpired leases that otherwise are separate or severable. *See In re FFP Operating*, 2004 Bankr. LEXIS 1192, at *13 (citing *In re Convenience USA, Inc.*, No. 01-81748, 2002 Bankr. LEXIS 348, 2002 WL 230772, at *2 (Bankr. M.D.N.C. Feb. 12, 2002)); *see also In re Szenda*, 406 B.R. 574 (Bankr. D. Mass. 2009) (citing *United Air Lines, Inc. v. U.S. Bank Trust Nat'l Assoc. (In re UAL Corp.)*, 346 B.R. 456, 467–68 (Bankr. N. D. Ill. 2006)). The bankruptcy court in *Szenda* explained that when there is no evidence to suggest that the Leases were "substantially connected to one another, so that a failure to enforce the clause would deprive the nondebtor party of an essential part of its bargain," the cross-default provisions did not keep the agreements from being severable. *Id.* at 580.

50.    Additionally, considering the "unanimity of the reported decisions recognizing the cross-default rule and Congress's recent reenactment of the Bankruptcy Code without amending § 365 to change the rule, the cross-default rule is indeed well established." *Id.* (citing *United Air Lines, Inc. v. U.S. Bank Trust Nat'l Assoc. (In re UAL Corp.)*, 346 B.R. 456, 467–68 (Bankr. N.D. Ill. 2005) and *The Shaw Group, Inc. v. Bechtel Jacobs Co., LLC (In re The IT Group)*, 350 B.R. 166, 177 (Bankr. D. Del. 2006) (noting uniformity of decision recognizing the cross-default rule); *see also, e.g., Lifemark Hosps.*, 304 F.3d 410, 444–45 (5th Cir. 2002); *EBG Midtown S. Corp. v. McLaren/Hart Envt'l Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 597 (S.D.N.Y. 1992) (holding that cross-default provision of two leases of separate floors was not enforceable and rejection of one lease did not prohibit assignment of the other), *aff'd,* 993 F.2d 300 (2d Cir. 1993); *In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 772, 779 (Bankr. W.D. Pa. 1985) (holding that cross-default provisions in insurance policies were unenforceable because they "would impermissibly restrict the Debtor's ability to assume some of the policies and reject others"), *aff'd* 67 B.R. 620 (W.D. Pa. 1986); *In re Sambo's Rests., Inc.*, 24 B.R. 755, 757 (Bankr. C.D. Cal. 1982) (concluding that cross-default provisions in leases were unenforceable because "[a]ny contractual restriction on assignment other than those specified in § 365(c) is proscribed by § 365(f)."); *See DB Structured Prod., Inc. v. Am. Home Mortgage Holdings, Inc. (In re Am. Home Mortgage Holdings, Inc.)*, 402 B.R. 87, 100 (Bankr. D.Del. 2009) ("contracts are economically interdependent when the consideration underlying each contract supports the other contract, such that non-performance under one contract would constitute a failure of the consideration underlying the other contract"); *In re Adelphia Bus. Solutions, Inc.*, 322 B.R. 51, 60 (Bankr. S.D.N.Y. 2005) (cross-default provisions in separate leases for separate locations in same building were not enforceable to prevent assumption of one lease and rejection of the other where the leases were

"not inextricably intertwined and interdepedent"); *In re Plitt Amusement Co. of Wash., Inc.*, 233

B.R. 837, 847 (Bankr. C.D.Cal. 1999) ("in the bankruptcy context, cross-default provisions do not

integrate otherwise separate transactions or leases"); *Kopel v. Campanile (In re Kopel)*, 232 B.R.

57, 65 (Bankr. E.D.N.Y.1999) ("Courts have refused to enforce cross-default provisions in

situations where the cross-defaulted agreements are not interrelated."); *In re Wheeling-Pittsburgh

Steel Corp.*, 54 B.R. 772, 779 (Bankr. W.D. Pa. 1985) (holding that cross-default provisions in

insurance policies were unenforceable because they "would impermissibly restrict the Debtor's

ability to assume some of the policies and reject others"), *aff'd* 67 B.R. 620 (W.D. Pa. 1986); *In

re Sambo's Rests., Inc.*, 24 B.R. 755, 757 (Bankr. C.D. Cal. 1982) (concluding that cross-default

provisions in leases were unenforceable because "[a]ny contractual restriction on assignment other

than those specified in § 365(c) is proscribed by § 365(f).").

51.     Here, as in *Szenda*, there is no argument or evidence "that a failure to enforce the

clause would deprive [KRS] of an essential part of its bargain" because the agreements are not

"economically interdependent"—that is, there is no indication that the "consideration for one

agreement supported the other" or that KRS "would not have entered into one agreement without

the other." *See id.* at 580. Indeed, the four leases were entered into with four different landlords on

four different dates.

52.     Contract law interpretations are property interests governed by state law and the

Leases select Texas law as the applicable law; thus, this Court must also apply Texas Law when

interpreting the Leases here. Under Texas law, leases have been found to be divisible and, thus,

can be selectively assumed or rejected. *See In re Wolflin Oil, LLC*, 318 B.R. 392 (Bankr. N.D.

Tex. 2004). No set test, however, exists to determine whether a contract is severable. *In re

Ferguson*, 183 B.R. 122, 125 (Bankr. N. D. Tex. 1995) (citing *Hamilton v. Tex. Oil & Gas Corp.*,

648 S.W.2d 316, 320 (Tex.App.—El Paso 1982, writ ref'd n.r.e.)). But Texas law does specify

that a contract's severability depends on three factors: (1) the intent of the parties; (2) the subject

matter of the agreement; and (3) the conduct of the parties. *Johnson v. Walker*, 824 S.W.2d 184,

187 (Tex.App.—Fort Worth 1991, no writ). The first factor, the intent of the parties, is given the

greatest weight. *Stewart Title Guar. Co.*, 83 F.3d at 739.

53.      For instance, in *Wolflin Oil, LLC*, applying the severability factors, the court

rejected the landlord's argument that the six leases in that case should be treated as a single

integrated transaction. 381 B.R. at 399. Instead, the court held that the leases were divisible and

could be individually assumed or rejected. First, the court analyzed the second factor—the subject

matter of the agreement—and found that "the subject matter of the leases c[ould] only point to a

finding that the leases [we]re severable and divisible" because each store was independently

managed and operated with its own staff. *Id.* at 397. Next, the court analyzed the third factor—the

conduct of the parties—and noted that instead of one master payment, the debtor paid monthly

rent for each location separately, which indicated divisibility rather than integration. *Id.* Last, the

court analyzed the first factor—the intent of the parties—and the court observed that while cross-

default provisions could suggest integration, other lease provisions favored divisibility. *Id*. at 398.

Specifically, each lease had unique rent calculations and related to different parties. *Id*. Plus, the

leases did not use the plural term "leases" to suggest a collective agreement. *Id*.

54.      Additionally, the *Wolflin* court, to distinguish the case of *Lifemark Hospitals, Inc.

v. Liljeberg Enters. (In re Liljeberg Enters.)*, 304 F.3d 410, 445 (5th Cir. 2002), also found that

the leases did not complement one another because each lease could operate independently and

even competed with one another. *Id.* at 399.

55.     Like *Wolflin*, here, the evidence supports that the Leases in question are severable and divisible. RH Seguin, RH Carrollton, RH Fort Worth, and RH Dallas each separately entered into its own Lease (there are four different Leases) with a distinct landlord (there are four different landlords) on different date (there are four different dates). Like *Wolflin*, here, the evidence supports that the Debtors' default on (and any subsequent cure obligations of) the Seguin Lease has no relation to any other Lease. Applying the first prong—the intent of the parties—similar to *Wolflin*, each Lease pertains to a different party with distinct rent calculations, reinforcing the intent for separate treatment. *See* 381 B.R. at 398. Notably, each Lease bears a specific landlord's name rather than a shared landlord across the Leases and each Lease's tenant is a separate and distinct legal entity. *Compare*, Seguin Lease, Ex. B at p.2 (naming Landlord as Guadalupe NH Development, Ltd. and Tenants as LBJM, L.L.C., dated July 8, 2010), *with,* the Fort Worth Lease, Ex. C at p.2 (naming Landlord as WAG Development, Ltd. and Tenants as Remarkable Healthcare of Fort Worth, LP, dated December 13, 2010), the Dallas Lease, Ex. D at p.2 (naming Landlord as GMP Dallas ND, Ltd. and Tenants as Remarkable Healthcare of Dallas, LP, dated March 9, 2012), and the Carrollton Lease, Ex. E at p.2 (naming Landlord as Mustang NH, LLC and Tenants as Remarkable Healthcare of Carrollton, LP, dated March 13, 2013).

56.     Next, here, the second factor—the subject matter of the agreement—also points to severability. The court in *Wolflin Oil* emphasized whether contracts can be divided into separate, independently performable agreements. *See* 381 B.R. at 397 (quoting *FFP Operating Partners, L.P.*, 2004 Bankr. LEXIS 1192, at *15 and *In re Convenience USA, Inc.*, 2002 Bankr. LEXIS 248, No. 01-81478, 2002 WL 230772, at *6 (Bankr. M.D.N.C. Feb. 12, 2002) (internal quotation marks omitted))). Here, each facility operates independently, with its own staff, residents, and equipment. Additionally, the Former Landlord and the different, applicable Remarkable entities executed each

lease in different years and with different landlords. Moreover, when KRS assumed the Leases in 2022, no language was added to the assignment to indicate a desire to integrate the Leases—KRS entered each agreement under a unique, location-specific affiliate entity. *See* Ex. F, Seguin Assignment. It is evident that from the Leases' inception and continuing through KRS's assumptions of the Leases, the Leases were intended to be operated separately and independently of each other.

57.     Last, the conduct of the parties here reflects an intent for the Leases to be considered separately from each other. In *Wolflin*, the court emphasized the payment method as indicative of severability. 381 B.R. at 397. Here, similar to *Wolflin*, each facility's rent is paid separately, rather than through a master payment, further affirming divisibility. *See id.* Moreover, the Remarkable Debtors' operations at RH Fort Worth ceased on April 26, 2024, while, on May 13, 2024, RH Carrollton and RH Dallas transitioned to new management. Only RH Seguin remains under Debtors' management.

58.     For these reasons, Debtors' obligations under the Seguin Lease are independent and severable from the obligations under the DFW Debtors' Leases; therefore, any cure obligations under the Seguin Lease do not require satisfying defaults under the DFW Debtors' Leases, as each Lease operates and stands on its own. For these reasons, at a minimum, to the extent KRS's First Claim includes amounts owed under the DFW Debtors' Leases, KRS's First Claim should be denied.

**C.  THE GRIFFIN NOTE IS NOT PART OF THE LEASE AND IS NOT ENTITLED TO ANY SPECIAL SECURED OR ADMINISTRATIVE DESIGNATION IN THESE CASES.**

59.     The fact that the Griffin Note was executed in conjunction with Remarkable's prior bankruptcy plan does not provide the Griffin Note any special secured designation in these Cases. As the court in *Official Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Sav. Bank* explained:

> The estate in a subsequent case contains all of the assets that the reorganized debtor holds upon the filing of the petition in that second case. These assets are then administered for the purpose of paying claims of that estate in accordance with the priorities as set forth in Section 507. In the later case, "the entity's unpaid liabilities under the first case plan become general unsecured claims."

256 B.R. 1, 104 (Bankr. M.D. Fla. 2000) (quoting *Official Committee of Unsecured Creditors of White Farm Equipment Co. v. United States (In re White Farm Equipment Co.)*, 943 F.2d 752, 757 (7th Cir. 1991) (quoting *In re Jartran*, 76 B.R. 123, 125 (N.D. Ill. 1987))).

60.     Moreover, it is not necessary for RH Seguin to cure the Former Landlord's Griffin Note to assume the Seguin Lease, because a note is not an executory contract if the only performance that remains is repayment. *In re Pennsylvania Tire Co.*, 26 B.R. 663, 674 (Bankr. N.D. Ohio 1982) (citing House Report No. 95-595, 95th Cong., 1st Sess. (1977) 347, U.S. Code Cong. & Admin. News 1978, pp. 5787, 6303-04).

61.     Furthermore, Mr. Rick Griffin, representative for the Former Landlord, admitted under oath at a hearing in these Cases that he did not sell, assign, or otherwise transfer the Griffin Note with KRS's assumption and assignment of the Leases in November of 2022. This is further evidenced by a letter written by counsel to KRS to the Debtors shortly after KRS assumed the Debtors' Leases. *See* Notice Letter. More specifically, the Notice Letter states, in relevant part:

> The Current Landlords did not assume the Rent Reduction and Note Deferment Agreement, **nor did the Current Landlords purchase the promissory note referred to therein**.

*Id.* (emphasis added).

62.      Since KRS Seguin did not assume or purchase the Griffin Note, the Griffin Note is not part of the Seguin Lease, the Debtors do not assume the Griffin Note, and the Debtors are not obligated to pay the Griffin Note to cure and assume the Seguin Lease.

**D.  KRS'S SECOND CLAIM IS NOT A SECURED CLAIM.**

63.      In order for a security interest to be enforceable against the debtor, there must be a security agreement covering the collateral. TEX. BUS. & COMM. CODE § 9.203(b). A security agreement must reasonably identify the collateral to be enforceable against the debtor. TEX. BUS. & COMM. CODE § 9.108. A description that is too broad, such as identifying the collateral as "all the debtor's assets" or "all the debtor's personal property" is insufficient as a matter of law. *Id.* at § 9.108(c).

64.      KRS Seguin has stated no basis upon which it alleges to hold a perfected security interest in any of the Debtors' assets, and KRS failed to attach any documentation to any of its multiple claims, the KRS Second Objection, or any other pleading to support its alleged security interest in the Debtors or their assets. KRS Seguin appears to base its security interest on the Seguin Lease, which is insufficient. KRS has failed to provide the Debtors with any evidence of a valid and perfected security interest, including any properly filed UCC-1 financing statement or other documents that support the KRS's assertion of a security interest.

65.      To the extent KRS Seguin alleges it holds, or actually holds, a statutory lien under Texas law (the "**Statutory Lien**"), such Statutory Lien is a lien for rent. The Debtors may avoid the Statutory Lien under Bankruptcy Code § 545(3), which states that "[t]he [debtor in possession] may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien . . . (3) is for rent." 11 U.S.C. § 545(3). Furthermore, KRS would hold a Statutory Lien pursuant to Tex. Rev. Civ. Stat. art. 5238, but to maintain this lien for rents that are more than six months past

due, a landlord is required to file a sworn, itemized statement of the amount of rent due with the

county clerk. *See McKesson-Crowdus Drug Co. v. Newman*, 86 S.W.2d 881, 882 (Tex. Civ. App.

1935). Failure to file this statement before the expiration of six months causes a landlord to lose

his right to a superior lien against unsecured and lien creditors who acquire rights prior to the filing

of such a verified claim with the county clerk. *Id.*

66.     Accordingly, here, any amounts due for rent prior to the Petition Date must have a

statement filed with the county clerk to be considered a priority or secured claim. *See* TEX. REV.

CIV. STAT. ART. 5238. Upon information and belief, KRS has filed no such statement with the

appropriate county clerk. KRS, therefore, does not hold a valid, perfected security interest in any

of the Debtors' property. Furthermore, the Debtors request that, to the extent applicable, the Court

enter an order in the Debtors' favor avoiding any Statutory Lien pursuant to rent under Bankruptcy

Code § 545(d).

**E.  THE DEBTORS ARE ENTITLED TO SET OFF THEIR CLAIMS AGAINST KRS.**

67.     The Debtors' claims against KRS should be offset against KRS's claims. Claims

subject to setoff must be disallowed by the Court under 11 U.S.C. § 502(d). Furthermore, section

558 of the Bankruptcy Code preserves for a debtor's estate "the benefit of any defense available

to the debtor as against any entity other than the estate." 11 U.S.C. § 558. Courts have interpreted

Section 558 to include setoff rights. *See, e.g., In re Westchester Structures, Inc.*, 181 B.R. 730,

739–40 (Bankr. S.D.N.Y. 1995) ("Section 558 of the Bankruptcy Code also preserves for the

benefit of the estate any right to setoff the debtor may have."); *In re RCS Cap. Dev.*, 2013 WL

3618550 at *8 (9th Cir. B.A.P. 2013) ("The Code preserves a debtor's right to effectuate a setoff

under § 558, as it exists under state law."). Unlike a creditor's right to set off under section 553 of

the Bankruptcy Code, section 558 of the Bankruptcy Code is broader and "eliminates the pre-

petition/post-petition distinction and, in essence, obliterates the requirement that the mutual debts

must both be pre-petition obligations." *See In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002)

(citations omitted); *see also State Bank of Florence v. Miller (In re Miller)*, 459 B.R. 657, 675 n.16

(B.A.P. 6th Cir. 2011) (holding that, unlike setoff under section 553 of the Bankruptcy Code, setoff

under section 558 does not require that the mutual debts both be prepetition obligations).

68.     Moreover, the Debtors' Leases are governed by Texas law, which provides a right

of setoff to debtors. *See* TEX. BUS. & COMM. CODE § 2A.508. Under Texas law, setoff is permitted

"where demands are mutual, between the same parties, and in the same capacity or right." *Cap.*

*Concepts Props. 85-1 v. Mut. First, Inc.*, 35 F.3d 170, 175 (5th Cir. 1994) (citing *Brook Mays*

*Organ Co., Inc. v. Sondock*, 551 S.W.2d 160, 166 (Tex. Civ. App.—Beaumont 1977, writ ref'd

n.r.e)); *Garden Ridge Corp.*, 338 B.R. at 633; *see Spillman Inv. Grp. Ltd. v. Am. Bank of Tex. (In*

*re Spillman Dev. Grp., Ltd.)*, 401 B.R. 240, 254 (Bankr. W.D. Tex. 2009), *aff'd sub nom. Fire*

*Eagle, LLC v. Spillman Inv. Grp., Ltd.*, A-10-CA-894-LY, 2011 WL 13234814 (W.D. Tex. Sept.

29, 2011), *aff'd sub nom. In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299 (5th Cir. 2013) ("[Setoff]

allows parties that owe each other money to apply their debts to each other, and applies where

there are mutual debts arising from different transactions.").

69.     KRS took over the DFW Facilities, at the latest, on May 13, 2024. Following the

KRS's assumption of the operations at the DFW Facilities, the Debtors still paid for a multitude

of expenses that KRS should have paid or reimbursed the Debtors for—which payments benefitted

KRS, not the Debtors' estates. The expenses total approximately $25,402.80 and include, but are

not limited to, payments to Optima, Inovalon, for business insurance, shredding, pest control, and

ExponentHR, among others. A true and correct copy of a spreadsheet listing these expenses and

providing additional information is attached hereto as **Exhibit K**.

70.     Accordingly, $25,402.80 should be set off against any claim this Court allows KRS in these Cases. Debtors, however, reserve the right to add any additional expenses to this list that are later discovered that the Debtors paid for and/or are proven at the hearing on this Objection.

71.     Therefore, to the extent this Court allows a claim for KRS, such claim amount should reflect the Debtors' setoffs.

## F.  KRS's CLAIMS AND THE FORMER LANDLORD'S CLAIMS ARE DUPLICATIVE.

72.     Rather than amend the first claim KRS filed, KRS filed an additional claim in each of the Remarkable Cases, except for RH LLC, that are wholly and fully duplicative and should not be allowed. Indeed, KRS's Second Claim merely adds an additional month of post-petition rent payments to KRS's First Claim and attaches an exhibit further detailing what makes up the amount claimed. KRS's Second Claim should be disallowed as duplicative of KRS's First Claim. If KRS's Second Claim is not disallowed, KRS will receive an excessive recovery to the detriment of other stakeholders in these Cases.

73.     Additionally, Former Landlord's claim is based on the same leases as KRS's Claims. The Former Landlord's Claim is in the amount of $995,867.80, which appears to represent the sum of $993,103.21 (the combined principal balance due) + $2,764.59 (late fee of five percent 5%). Similarly, at least KRS's First Claim is based on minimum past-due lease amounts. The claims are duplicative, at least in part, and thus should be rejected unless and until the KRS Landlord and the Former Landlord (together, the "**Landlords**") can provide the necessary documentation and calculations evidencing otherwise. The fact that both Landlords share the same counsel is another indication that the claims overlap. Inarguably, claimants are not allowed to submit duplicative proofs of claims. *See, e.g., In re Dronebarger*, 2011 Bankr. LEXIS 452, at *10-11 (Bankr. W.D. Tex. 2011) (determining that claimants are entitled to only one recovery on duplicative proofs of claim).

74.    Lastly, rather than amending KRS's First Claim, Debtors note that counsel for KRS wasted Debtors' time and resources by forcing them to respond to two Claims – Claims which are substantially duplicative of each other, in addition to materially overlapping with the Former Landlord's Claim.

**G.   TO THE EXTENT THAT KRS'S SECOND CLAIM IS ALLOWED, IT MUST BE SUBJECT TO THE 11 U.S.C. § 502(B)(6) STATUTORY CAP.**

75.    The statutory cap provided by 11 U.S.C. § 502(b)(6) should limit KRS's Second Claim. Section 502(b)(6) of the Bankruptcy Code states:

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that…
>> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
>>> (i) the date of the filing of the petition; and
>>> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

76.    Bankruptcy Code Section 502(b)(6) provides that "damages resulting from the termination of a lease of real property" are subject to the statutory cap. *See* 11 U.S.C. § 502(b)(6). Some courts have held that the section 502(b)(6) cap applies to all damages of any kind that are sought by a landlord, regardless of whether the damages are attributable to a lease termination or instead are attributable to other events or factors. *See, e.g., In re Foamex Int'l, Inc.*, 368 B.R. 383, 393-394 (Bankr. D. Del. 2007) (holding that a rejection results in a breach of all covenants of a lease and that any claim for breach of any covenant is covered by the section 502(b)(6) cap). The stronger interpretation, and the one dictated by the plain language of the statute, is that the statutory

cap applies only to damages that are attributable to the fact that the term of the lease has come to an end. The Court of Appeals for the Ninth Circuit has adopted a simple test for this purpose: "Assuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?" *See In re Rock & Republic Enters.*, 2011 Bankr. LEXIS 2401, at *80 (quoting *Saddleback Valley Cmty. Church v. El Toro Materials Co. (In re El Toro Materials Co.*), 504 F.3d 978, 980-981 (9th Cir. 2007)).

77.     Thus, to the extent that KRS's Second Claim is damages resulting from the termination of the leases, those damages must be capped pursuant to 11 U.S. Code § 502(b)(6).

## RESERVATION OF RIGHTS

This Objection only addresses certain of the claims listed in the KRS Second Claim, and the Debtors' omission of a specific response to the unaddressed claims listed in the KRS Second Claim shall not be considered an acquiescence, agreement, or admission to any such claim, nor is it a waiver of the Debtors' right to address, respond, or reply to any claims listed in the KRS Second Claim or any joinder thereto. The Debtors reserve their rights to amend and/or supplement this Objection.

## CONCLUSION

**WHEREFORE**, Debtors respectfully request that the Court enter an order: (a) disallowing KRS's Second Claim, Claim No. 15-1, in its entirety; and (b) granting the Debtors such other and further relief as this Court may deem just and proper.

Dated: January 12, 2025
     Dallas, Texas

**GUTNICKI LLP**

*/s/ Liz Boydston*
Liz Boydston (SBN 24053684)
Alexandria Rahn (SBN 24110246)
8080 N Central Expy., Ste. 1700
Dallas, Texas 75206
Telephone: (469) 895-4413
Facsimile: (469) 895-4413
lboydston@gutnicki.com
arahn@gutnicki.com

-and-

Max Schlan (admitted *Pro Hac Vice*)
45 Rockefeller Plaza, Suite 2000
New York, New York 10111
Telephone: (646) 825-2330
Facsimile: (646) 825-2330
mschlan@gutnicki.com

*Counsel for the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on January 12, 2025, I caused to be served the foregoing Objection via CM/ECF email upon all parties accepting said service, including the KRS Landlord and the Former Landlord and (a) the Office of the United States Trustee for the Eastern District of Texas; (b) the Office of the Attorney General of Texas; (c) the Debtors' 20 largest unsecured creditors on a consolidated basis; (d) the Internal Revenue Service; (e) the Subchapter V Trustee; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002. To the extent one of the above has not consented to service via CM/ECF, I caused the foregoing to be served via U.S.P.S.

*/s/ Liz Boydston*
Liz Boydston