**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CHAPTER 11** |
| | § | |
| **REMARKABLE HEALTHCARE LLC** | § | **CASE NO. 24-40611** |
| **AND REMARKABLE HEALTHCARE** | § | |
| **OF SEGUIN, LP,** | § | **(Jointly Administered)** |
| | § | |
| **DEBTORS.** | § | **(Formerly Jointly Administered Under** |
| | § | **Lead Case: Remarkable Healthcare of** |
| | § | **Carrollton, LP, et al., 24-40605)** |

**MEMORANDUM OPINION AND ORDER
DENYING CONFIRMATION OF DEBTORS' FOURTH AMENDED PLAN**

On January 13, 2025, this Court concluded a hearing on whether to confirm the Fourth

Amended Joint Subchapter V Plan of Reorganization for Remarkable Healthcare of Seguin, LP

and Remarkable Healthcare, LLC [Docket No. 180] (the "Fourth Amended Plan") of the above

captioned debtors and debtors-in-possession (collectively, the "Debtors"). The Court announced

its decision to deny confirmation at the conclusion of the hearing for the reasons stated on the

record and set forth more fully in this memorandum opinion and order. The following constitutes

the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52,

as incorporated into contested matters in bankruptcy cases by Federal Rules of Bankruptcy

Procedure 7052 and 9014.

**FINDINGS OF FACT[1]**

1.      **Prior Chapter 11 Filings**. The Debtors commenced these Chapter 11 cases on

---

[1] To the extent that any finding of fact is construed to be a conclusion of law, it is adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is adopted as such. If there is an inconsistency between this Court's oral ruling on the record and this memorandum opinion, this memorandum opinion controls.

March 20, 2024.[2] These are the Debtors' third Chapter 11 filings since 2018.

2.      Prior to bankruptcy, the Debtors managed a skilled nursing facility in Seguin, Texas. The Debtors are owned by John and Laurie Beth McPike. Mrs. Laurie Beth McPike is the Chief Executive Officer for the Debtors, and Mr. John McPike is the Chief Operating Officer.

3.      The Debtors first filed for relief under Chapter 11 of the Bankruptcy Code on February 2, 2018 (Lead Case No. 18-40295) and obtained confirmation of a plan of reorganization on May 16, 2019. The Debtors filed their second bankruptcy (Lead Case No. 23-42098) on November 2, 2023, and their cases were dismissed on February 9, 2024, because of the Debtors' inability to confirm a plan.[3] The Debtors' current cases were filed less than two months after the dismissal of the Debtors' prior cases.

4.      The pre-petition secured lender for the Debtors sought the appointment of a state court receiver after the dismissal of their prior cases. The Debtors filed these cases against the wishes of their landlord and their pre-petition secured lender. The Debtors' relationship with their landlord and their pre-petition secured lender has been adversarial throughout their current cases.

5.      According to their bankruptcy schedules, the Debtors had assets totaling $2,559,240.12 and liabilities totaling $3,575,787.62 on the petition date. Most of the assets listed in the Debtors' schedules consisted of accounts receivable.

6.      At or around the time the Debtors filed these cases, the nursing facility in Seguin

---

[2] Originally, these two cases were jointly administered with the cases of three affiliated debtors under Lead Case No. 24-40605. This Court subsequently converted the cases of the three affiliated debtors to Chapter 7, including the debtor in the lead case, and ultimately dismissed the three affiliated cases. These two remaining cases are being jointly administered under a new Lead Case No. 24-40611, which is the bankruptcy case number assigned to Remarkable Healthcare of Seguin, LP. For clarity, the Court has identified case numbers and docket numbers throughout this memorandum opinion.

[3] In the Debtors' prior bankruptcy filing, the Court dismissed their cases with prejudice to refiling for a year. The Debtors thereafter obtained new counsel and petitioned to modify the dismissal order. The Court modified the dismissal order by removing the bar to re-filing for bankruptcy. The Debtors thereafter filed these cases.

received a notice of disconnect from its water utility for unpaid bills.

7.      **The Prepetition Transactions**. Between the dismissal of their prior cases and the filing of their present cases, Remarkable Healthcare of Seguin, LP ("RH-Seguin") and West Wharton County Hospital District, a governmental entity and body politic established pursuant to Chapter 286 of the Texas Health and Safety Code ("WWCHD" or the "Hospital District"), entered into a Sublease Agreement as well as an Operations Transfer Agreement whereby the Hospital District became the licensed operator of a licensed skilled nursing facility known as "Remarkable Healthcare of Seguin" located in Seguin, Texas (the "Facility").[4] RH-Seguin and the Hospital District simultaneously entered into a Management Agreement dated March 1, 2024, whereby RH-Seguin became the manager of the Hospital District's licensed Facility.

8.      RH-Seguin entered into the Sublease Agreement, Operations Transfer Agreement, and Management Agreement with the Hospital District in order to participate in the Texas Quality Incentive Payment Program for Nursing Facilities (the "QIPP"). Texas makes incentive payments to non-state government-owned nursing facilities under the QIPP to encourage the facilities to improve the quality of their services based on several quality measures. *See* 1 TEX. ADMIN. CODE § 353.1301-04. Section 5.12 and 5.13 of the Management Agreement provide that, after offsetting certain inter-governmental transfers, the Hospital District and RH-Seguin would split the remaining QIPP revenue 70/30 – 70% to RH-Seguin and 30% to the Hospital District.

9.      As part of the foregoing operations transfer, the Hospital District (and/or RH-Seguin) applied to the Texas Health and Human Services Commission (the "HHSC") for a change of ownership of the Facility's license and Medicaid contract from RH-Seguin to the Hospital

---

[4] KRS Seguin, LLC owns the property where the Facility is located. RH-Seguin leased the property from KRS Seguin, LLC, and the Hospital District now subleases the property.

District. *See* 1 TEX. ADMIN. CODE. § 353.1302(b)(1). The Hospital District (and/or RH-Seguin) also applied for a transfer of RH-Seguin's Medicare Identification Number and provider agreement to the Hospital District. *See* 42 C.F.R. § 489.18. The parties have referred to these applications for a change of ownership ("CHOW") as the "CHOW applications."

10.     Inasmuch as the relevant government entities take some time to approve a change of ownership, the receivables created during the pendency of the application are held (the "CHOW hold"). The Hospital District and RH-Seguin anticipated the CHOW hold and the temporary disruption to the collection of receivables that the CHOW applications would cause. Accordingly, pursuant to Section 6.2 of the Management Agreement, the Hospital District provided RH-Seguin with "Interim Working Capital," not to exceed $514,521, to be funded in increments upon a written request by RH-Seguin.

11.     Under the Management Agreement, the Hospital District engaged RH-Seguin as the "Manager" to act as an independent contractor with the duty to manage the Facility on the Hospital District's behalf in accordance with the terms and conditions of the Management Agreement. Section 2.2.1 provided that "[n]othing contained in this Agreement shall be deemed or construed to create a partnership, joint venture, or employment relationship …." Section 5.1.1 of the Management Agreement provided for payment of a "Base Management Fee" to RH-Seguin in consideration for its services as Manager under the Management Agreement, and Section 5.1.2 provided for an "Incentive Payments" equal to 70% of the net operating income of the Facility.

12.     Among other things, Paragraph 2.2.3(c) of the Management Agreement provided that RH-Seguin's duties as Manager included billing all patients and governmental or third-party payors for all services provided by the Hospital District, as operator, at the Facility.

4

13.      The Management Agreement did not grant RH-Seguin any ownership interest in receivables or allow RH-Seguin to transfer the proceeds of any accounts receivable to itself. Section 7.2 of the Management Agreement provided that "Total Net Revenue derived from operation of the Facility" shall be deposited into a "Depository Account," which "shall be the sole and exclusive property of the Hospital District…." Section 7.2 further provided that revenue would be transferred to a "Facility Operating Account" pursuant to a cash management system and that the "Facility Operating Account" would be the "sole and exclusive property of Manager."

14.      To secure the Hospital District's obligations to RH-Seguin under the Management Agreement, Section 7.2 also provided RH-Seguin with a security interest in the Hospital District's "Depository Account." In general, however, Section 2.3.3 of the Management Agreement prohibited RH-Seguin from pledging or providing a security interest in any assets of the Hospital District – "provided, however, that Manager may pledge a security interest in the Facility Operating Account as collateral for working capital or HUD financing…."

15.      Throughout these cases, the Debtors have represented to the Court that the transfer of ownership of the Facility to the Hospital District, and the QIPP revenue they expected to receive under the Management Agreement, were integral to their reorganization in bankruptcy.

16.      **The Initial Reorganization Plan**. The statutory deadline for the Debtors to file a plan of reorganization was June 18, 2024, which was 90 days after the petition date. *See* 11 U.S.C. § 1189(b). The Debtors requested, and received, an extension of that deadline to August 19, 2024 [Case No. 24-40605, Docket No. 266].

17.     The Debtors filed their initial plan on August 19, 2024 [Case No. 24-40605, Docket

No. 328].[5] Despite the extension of time the Debtors had received to file a plan, their initial plan

did not include a liquidation analysis as required by § 1190 of the Bankruptcy Code, discussed

below. The Debtors stated in their plan that they anticipated that all distributions would be funded

from cash on hand and future earnings.

18.     The Court scheduled a confirmation hearing for October 2, 2024.

19.     On September 9, 2024, landlords and parties in interest KRS Carrollton, LLC *et al.*

(collectively, "KRS") filed an emergency motion seeking relief from the automatic stay for cause

[Case No. 24-40605, Docket No. 354] (the "KRS Lift Stay Motion"). The Debtors' pre-petition

secured lender, Alleon Capital Partners, LLC ("Alleon"), joined in the request for stay relief [Case

No. 24-40605, Docket No. 380]. The moving parties complained that the Debtors' initial plan did

not include all the information required by 11 U.S.C. § 1190. KRS specifically complained that

the initial plan did not include a liquidation analysis and the cash flow projections, which are also

statutorily required, were incomplete and confusing. In addition, and among other things, KRS

objected that RH-Seguin (as the manager of the Facility) had failed to pay its employees, pay its

payroll taxes, or pay all the rent due and owing to KRS since the bankruptcy petition date.

20.     On September 11, 2024, the Debtors filed an Emergency Motion to Compel West

Wharton County Hospital District to Turnover Funds [Case No. 24-4065, Docket No. 374] (the

"Motion to Compel"). RH-Seguin thereby sought to compel the Hospital District to deposit funds

in the Facility Operating Account for the Debtors to use to manage the Facility. At the hearing on

the Motion to Compel, the Debtors argued that the accounts receivable generated through the

---

[5] The three affiliated debtors filed a joint plan of liquidation on the same date. [Case No. 24-40605, Docket No. 329].
Ther plan did not include a liquidation analysis but stated that one was "to be filed."

operation of the Facility were property of the estate that the Hospital District could be compelled to turnover. The Hospital District disagreed. The parties' settlement of the Motion to Compel temporarily quelled this dispute in the Hospital District's favor.

21.    After an emergency hearing on September 18-19, 2024, the Debtors and the Hospital District presented the Court with an agreed order settling their dispute, which the Court entered on September 20, 2024 [Case No. 24-40605, Docket No. 402]. The Hospital District thereby agreed to advance certain funds to the Debtors in exchange for an allowed, super-priority administrative expense claim of $420,000 plus the Hospital District's reasonable attorney's fees, among other things. The Court entered an amended order on October 15, 2024 [Case No. 24-40605, Docket No. 433] at the parties' request.

22.    The parties' settlement agreement stated in pertinent part that "[s]olely for this Settlement Term Sheet and only until Hospital District's Allowed Super-Priority claims are paid in full," the parties agreed that "all revenues, monies, accounts, payments and other proceeds arising from or related to the operation of the Facility ... are the sole and exclusive property of Hospital District …."  The parties' settlement agreement also required the Debtors to confirm a plan by December 30, 2024, and the agreement required that the confirmed plan be effective by February 28, 2025.

23.    From the petition date through September 2024, the Debtors' cases were jointly administered with the cases of three affiliated debtors. The affiliated debtors were operating skilled nursing facilities at three other locations on the petition date. However, the affiliated debtors required emergency financing from KRS to pay their employees immediately after filing for bankruptcy. One of the affiliated Debtors (Remarkable Healthcare of Fort Worth, LP) ceased operations on April 19, 2024, after losing its license to operate due to deficiencies that placed

residents in immediate jeopardy. And the other two affiliated debtors (Remarkable Healthcare of Carrollton, LP and Remarkable Healthcare of Dallas, LP) were transitioned to new management due to the threat to patient care pursuant to the terms of an Amended Show Cause Order entered on May 10, 2024, and amended on May 14, 2024 [Case No. 24-40605, Docket Nos. 103 and 106].

24.     Administrative expenses continued to mount in the three affiliated cases. The three affiliated debtors also received notices from the Centers for Medicaid and Medicare asserting rights to setoff amounts for alleged prepetition penalties. Eventually, on September 20, 2024, the three affiliated debtors filed an emergency motion to convert their Chapter 11 reorganization cases to Chapter 7 liquidation cases. [Case No. 24-40605, Docket No. 404]. The Court granted their motion after an emergency hearing on September 30, 2024 [Case No. 24-40605, Docket No. 423].

25.     The hearing on confirmation of the Debtors' original plan of reorganization had been scheduled for October 2, 2024 (the "First Confirmation Hearing"). The Court conducted that hearing as a status conference in light of recent events. On October 1, 2024, the day before the scheduled hearing, the Debtors filed a liquidation analysis and updated cash flow projections. [Case No. 24-40605, Docket No. 417].

26.     At the First Confirmation Hearing, the Court extended the deadline for the Debtors to amend their original plan to October 18, 2024. The Court also scheduled another confirmation hearing to be held on December 3, 2024.

27.     **The First Amended Reorganization Plan**. The Debtors filed and served their first amended reorganization plan [Case No. 24-40611, Docket No. 38] (the "First Amended Plan") on October 18, 2024. Among other things, the First Amended Plan treated all classes as unimpaired, with a 100% recovery. The First Amended Plan also provided that the Debtors would require a

loan of $1,800,000 to fund liabilities accrued during the bankruptcy cases and distributions to creditors.

28.     On October 22, 2024, the Court entered an order scheduling voting and objection deadlines and setting a confirmation hearing on the First Amended Plan for December 3, 2024 (the "Second Confirmation Hearing") [Case No. 24-40611, Docket No. 41]. The Debtors solicited votes from creditors on their First Amended Plan. The Debtors submitted a ballot summary reflecting that voting classes rejected the First Amended Plan. Only one creditor (American Express National Bank) voted to accept the First Amended Plan.

29.     The Debtors appeared for the December 3rd confirmation hearing. At the Debtors' request, the Court continued the December 3rd confirmation hearing to December 6, 2024 (the "Third Confirmation Hearing") so that the Debtors could finalize their exit financing and continue negotiations with KRS about the amount needed to cure the defaults under the lease of the Facility. The Court also continued the hearing on the KRS's Lift Stay Motion to the same date and time.

30.     The Debtors appeared on December 6th and requested another continuance to finalize loan documentation with their proposed exit lender. The Court granted the Debtors' request, setting a continued confirmation hearing on December 9, 2024. The Court also continued the hearing on KRS's Lift Stay Motion to the same date and time.

31.     On the same day as the December 6th confirmation hearing, the Internal Revenue Service (the "IRS") filed a motion to dismiss the Debtors' bankruptcy cases [Docket No. 143]. In its motion, the IRS alleged that the Debtors had failed to pay any of the federal taxes the Debtors had withheld from their employees' income for Social Security, Medicare and federal income taxes since filing for bankruptcy. These taxes are often referred to as trust fund taxes or "Form 941" taxes in reference to the form businesses use to report income taxes and payroll taxes withheld

from their employees' wages. According to the IRS: "The Debtors have filched taxpayer dollars, including their own employees' withholdings, and Medicare and Social Security obligations, to fund the operations of their business and/or pay themselves." The IRS argued that the Debtors' failure to abide by their tax responsibilities was cause for dismissal under § 1112(b)(4)(I) of the Bankruptcy Code.

32.    The Debtors' failure to pay Form 941 taxes after filing these bankruptcy cases had been referenced during prior hearings as well as in the Lift Stay Motion filed by KRS on September 9, 2024. Notwithstanding the concerns raised by creditors such as KRS and Alleon throughout these cases, the Debtors failed to take corrective action or make any payment of Form 941 taxes to the IRS during these cases, thereby exposing their employees to potential liability for amounts the Debtors had represented they were withholding from their paychecks.[6]

33.    The Debtors appeared at the continued confirmation hearing on December 9, 2024 (the "Fourth Confirmation Hearing"). The Debtors announced that they had been unable to obtain a commitment for exit financing from their proposed lender and that negotiations had broken down with KRS. The Debtors announced they were unable to go forward with confirmation.

34.    The Hospital District announced on the record that it was agreeable to a 30-day extension of the December 30th deadline set forth in the parties' settlement agreement for the Debtors to confirm a plan.

35.    At the conclusion of the hearing on December 9, 2024, the Court orally (i) granted the KRS Lift Stay Motion; and (ii) continued the confirmation hearing to January 7, 2024 (the "Fifth Confirmation Hearing"). As set forth in the Court's ruling on December 9th, the Court set

---

[6] *See* 26 U.S.C. § 6672 ("Failure to Collect and Pay Over Tax, Or Attempt to Evade Tax"). *See also, generally, Brounstein v. United States*, 979 F.2d 952 (3d Cir. 1992) (discussing the liability of a "responsible person" under § 6672).

the following deadlines with respect to the continued confirmation hearing and the lifting of the automatic stay:

    i.    First, the Court ordered the Debtors to file a further amended plan by no later than December 16, 2024;

    ii.    Second, the Court ordered the Debtors to file a plan supplement by no later than December 30, 2024, demonstrating that the Debtors had obtained a firm, unconditional commitment to fund an amount sufficient to fully fund the Debtors' plan, including 100% of all Form 941 payroll tax liabilities through December 31, 2024, with no outs for the proposed lender, and with evidence of the lender's (i) ability (*i.e.*, financial wherewithal) and (ii) willingness to fund.

36.    The Court also ruled that, in the event the Debtors failed to obtain a firm exit financing commitment by December 30, 2024, or to confirm a plan by January 8, 2025, the automatic stay would immediately lift, annul, and terminate with respect to both KRS and Alleon,

37.    **The Second Amended Reorganization Plan**. The Debtors filed and served their second amended reorganization plan [Docket No. 158] (the "Second Amended Plan") on December 16, 2024, and their Notice of Exit Financing [Docket No. 164] on December 30, 2024. Like the First Amended Plan, the Second Amended Plan treated all creditors as unimpaired due to an estimated 100% recovery. However, the amount needed to finance the Debtors' reorganization had increased from $1.8 million to $3 million.

38.    The Court reviewed the Notice of Exit Financing the Debtors filed on December 30, 2024, to supplement the Second Amended Plan. The Notice of Exit Financing did not identify the lender, the terms of the loan agreement, or provide any evidence that the proposed lender had

11

the ability to fund. Rather, the Notice of Exit Financing simply stated that an unidentified lender had committed to provide $3 million in exit financing and that the exit financing would be enough to fund all amounts necessary for confirmation.

39.     The evidence of funding the Debtors submitted on December 30th did not contain all the averments required by the Court's oral ruling on December 9, 2024. The Court then entered an order granting the KRS Lift Stay Motion [Docket No. 165] (the "Lift Stay Order"), memorializing its December 9th oral ruling and allowing the Debtors additional time – until January 6, 2025 – to file a supplemental notice of exit financing in accordance with the Court's oral ruling as set forth in Paragraph 4(a) of the Lift Stay Order.

40.     Paragraph 7 of the Lift Stay Order expressly provided that the relief granted by the Order was effective immediately and that the 14-day stay generally imposed by Bankruptcy Rule 4001(a) on orders granting relief from the stay did not apply to the Lift Stay Order.

41.     **The Third Amended Reorganization Plan**. On January 6, 2025, the day before the Fifth Confirmation Hearing, the Debtors filed a third amended reorganization plan (the "Third Amended Plan") [Docket No. 172] as well as a Supplemental Notice of Exit Financing [Docket No. 171]. The Third Amended Plan treated all creditors as unimpaired due to an estimated 100% recovery. The Supplemental Notice of Exit Financing attached certain loan documents (the "Loan Documents") regarding a $3 million exit facility from a new proposed exit lender, Renew Partners, LLC ("Renew").

42.     More specifically, the Loan Documents provided for repayment of the $3 million loan over five years at 17% interest. The Loan Documents required payment of interest only for the first year, payments of principal and interest for four years, and then a balloon payment at the end. The Loan Documents did not include salient payment terms for years 2-5. The Loan

Documents referenced an amortization schedule when discussing the terms of repayment, but the amortization schedule was not attached or otherwise described.

43.     The Loan Documents also provided that Renew would receive, as security, "[a]ll accounts receivable beginning March 20, 2024, forward, with the exception of July 2024 Medicaid and West Wharton is reimbursed for an extended Line of Credit and all future Accounts Receivable generated in the course of normal business." The Loan Documents provided that as additional security Renew would receive "all securities evidencing ownership interest in Borrower."

44.     The Loan Documents filed on January 6th did not meet the requirements of the Lift Stay Order. The Debtors did not submit sufficient evidence of a firm commitment to finance, as required by the Lift Stay Order. The Debtors also did not submit evidence of the proposed lender's ability to fund the exit financing.

45.     On January 7, 2025, the Court began the confirmation hearing on the Third Amended Plan (filed on January 6, 2025). Creditors at the hearing objected to the last-minute filing of the Third Amended Plan.

46.     The Debtors did not produce a witness to testify on behalf of Renew. The Court heard testimony of the Debtors' chief witness and Chief Operating Officer, Mr. John McPike, in support of the Third Amended Plan. Mr. McPike testified, among other things, that the Debtors' QIPP revenue would amount to $1,262,194 each year. Mr. Pike was extensively cross-examined about the amount of QIPP revenue in the Debtors' cash flow projections.

47.     The confirmation hearing did not conclude on January 7, 2025, due to time constraints. After Mr. McPike concluded his testimony, the Court continued the confirmation hearing to January 13, 2025 (the "Sixth Confirmation Hearing").

48.     **The Fourth Amended Reorganization Plan**. On January 9, 2025, without seeking prior leave of the Court, and once again past the December 16th deadline previously set by the Court for the Debtors to amend their proposed plan, the Debtors filed a fourth amended reorganization plan (the "Fourth Amended Plan"). The Fourth Amended Plan, among other things, called for new cash flows that had previously not been included in their projections and reduced cash flows that had previously been included. For example, the Fourth Amended Plan included the following material modifications:

i.      For the first time among all of its plans, the Debtors reduced the recovery for Class 3 (General Unsecured Claims) from 100% to 20%, thereby impairing holders of Class 3 claims, including KRS and Alleon;

ii.     For the first time among all its plans, the Debtors added a new revenue line item labeled "2024 A/R uncollected at 96%" in the amount of $1,274,605.00; and

iii.    The Debtors reduced annual QIPP revenue from $1,262,194 to $503,051.

49.     The Debtors' modifications in the Fourth Amended Plan were material and substantial to all creditors. The modifications were particularly adverse to general unsecured creditors, whose projected recovery was reduced by 80% in the Fourth Amended Plan.

50.     The Fourth Amended Plan specifically depended on Renew to provide $3 million for exit financing on the Plan's effective date in order to pay accrued post-petition liabilities. According to the Debtors' cash flow projections dated January 9, 2025, the $3 million would be used to pay "Alleon Replacement Liens" of $421,024, "other cure claims" of $100,000, "administrative claims" of $430,000, "West Wharton payment" of $480,000, "KRS cure claim" of $1,307,073, and a "lender origination fee" of $45,000.

51.     Additionally, in their liquidation analysis, the Debtors estimated that they accrued attorneys' fees of $800,000 during these cases. Counsel for the Debtors represented to the Court that the Debtors would not be required to pay these fees on the Fourth Amended Plan's effective date but, instead, would pay their attorneys' reasonable fees over time on mutually agreeable terms.

52.     The Debtors did not mail or otherwise serve the Fourth Amended Plan on all creditors and parties-in-interest prior to the continued confirmation hearing. The creditors participating in the confirmation hearing received limited notice of the Fourth Amended Plan as they received it (or electronic notice that it had been filed) less than three days before the continued hearing.

53.     On January 13, 2025, the day of the continued confirmation hearing, the Debtors filed a stipulation they had entered into with the Hospital District after Mr. McPike's testimony on January 7, 2025. The stipulation corrected, and reduced, the amount of QIPP revenue the Debtors could be entitled to receive from $1,262,194 to $503,050.94 annually. The stipulation contradicted Mr. McPike's previous testimony about the amount of revenue the Debtors would receive under the QIPP in future years.

54.     The Court held the continued confirmation hearing on January 13, 2025. It lasted over twelve hours. The creditors opposing confirmation objected to the last-minute filing of the Fourth Amended Plan as insufficient notice to be able to test the Debtors' new cash flow projections. The Debtors presented evidence, including additional testimony from Mr. McPike, and testimony from Rudolph Renda, a principal of Renew.

55.     Among other things, Mr. McPike testified that he had discovered approximately $1,274,000 in accounts receivable from 2024 that had not yet been collected. He testified that these new receivables more than offset the approximately $700,000 reduction in QIPP revenue for the

first year in the Debtors' cash flow projections. There was no testimonial or documentary evidence of the type of receivables, the ownership of the receivables, the age of the receivables, or any other evidence of collectability other than Mr. McPike's assertion that RH-Seguin had historically collected 96% of its receivables. Given that the $1,274,000 constitutes a part of the Debtors' assets (if the receivables belong to the Debtors, as the Debtors have claimed), the failure to include these accounts receivable in prior projections was not satisfactorily explained.

56.     Significantly, this is the Debtors' third bankruptcy filing. In the first filing, the Debtors confirmed a plan only to return to bankruptcy four years later. In the second filing, the Debtors could not confirm a plan and their cases were dismissed. Less than two months later, the Debtors filed these cases. And yet the Debtors do not seem to have a firm grasp on the amount of their accounts receivable or fiscal outlook.

57.     The outstanding accounts receivable due from Medicare and Medicaid for service provided after March 1, 2024, are for services provided under the Hospital District's license. Nonetheless, the Debtors tried to claim all the proceeds in the Hospital District's Depository Account as their own. The Debtors provided no evidence that the outstanding Medicare and Medicaid receivables were owned by RH-Seguin. The Debtors also miscalculated their expected QIPP revenue, omitted $1,274,000 in receivables from 2024, and failed to report and pay post-petition trust fund taxes to the IRS, including Social Security, Medicare and federal income taxes withheld from employees' paychecks for work performed during these bankruptcy cases. The Debtors also underestimated their financial need, going from no exit financing, to $1.8 million in exit financing, to $3 million in exit financing. This ever-increasing need for a loan to pay debts incurred post-petition reveals the Debtors' inability to earn sufficient cash flows to cover expenses during the pendency of their bankruptcy cases.

16

58.     Given the magnitude of the last-minute fluctuations in the Debtors' projections, and the alleged reasons for these fluctuations, the Debtors' cash flow projections for the Fourth Amended Plan appeared unrealistic, unreliable, and unreasonable.

59.     Mr. Renda ignored a subpoena to appear and testify in person at the confirmation hearing and, instead, testified telephonically from Canada. When questioned about the subpoena, Mr. Renda testified that he flew to Canada after service of the subpoena for personal reasons. Mr. Renda declined to elaborate or explain why he had traveled to Canada after receiving the subpoena.

60.     Mr. Renda testified that Renew was prepared to close on the exit financing on the terms set forth in the Loan Documents. However, it was clear from Mr. Renda's testimony, from the face of the Loan Documents, and from Mr. McPike's testimony, that there were open issues. For example, Mr. McPike had testified that he believed he would not actually need to pledge his ownership interest in the Debtors to Renew as security for the exit financing. He testified that he believed that Renew would agree to waive or delete that provision from the Loan Documents.

61.     In addition, the Debtors had offered Renew an interest in their "accounts receivable" to secure the exit financing, but language in the Loan Documents was broad and vague and could have been interpreted as requiring a pledge of assets beyond RH-Seguin's authority under the Management Agreement. The Hospital District, as the operator of the Facility, was not a signatory on the Loan Documents. The Hospital District had not agreed that RH-Seguin, its manager under the Management Agreement, could use existing and future receivables generated from the operation of the Facility to secure financing to fund a bankruptcy plan so that RH-Seguin could exit bankruptcy.

62.     When it became clear that the Debtors and Renew had different interpretations, the Court provided Renew and the Debtors an opportunity to clarify the Loan Documents. After a

discussion between Renew and the Debtors, the Debtors' counsel reported to the Court that Renew required the collateral set forth in the Loan Documents as drafted.

63.     KRS presented evidence opposing confirmation, including the testimony of its principal, Josh Kilgore. Alleon presented evidence opposing confirmation, including the testimony of its principal, Leon Chernyavsky. The Court also heard from the IRS, a creditor and party-in-interest that likewise opposed confirmation.

64.     At the conclusion of the proceedings on January 13, 2025, the Court orally denied confirmation and noted that the Debtors' failure to obtain confirmation of the Fourth Amended Plan also resulted in the termination of the automatic stay of Bankruptcy Code § 362(a) as to KRS and Alleon, as provided under the Lift Stay Order.

## CONCLUSIONS OF LAW

65.     **Jurisdiction and Venue**. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334(a) and (b), 11 U.S.C. §§ 1190, 1191 and 1129, and Federal Rule of Bankruptcy Procedure 3020. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(1), (b)(2)(A) and (b)(2)(L) because it involves matters concerning administration of the estate and confirmation of a Chapter 11, subchapter V plan of reorganization. Venue is proper under 28 U.S.C. §§ 1408 and 1409. And the Court has authority to adjudicate this matter pursuant to the District Court's Standing Order of Reference.

66.     **Subchapter V of Chapter 11 (Generally)**. The Debtors filed their cases under subchapter V of Chapter 11 of the Bankruptcy Code. Subchapter V focuses on smaller debtors engaged in commercial or business activities. *See* 11 U.S.C. § 1182 (defining the term "debtor" as a "small business debtor"). Subchapter V modifies the traditional Chapter 11 platform to provide a more streamlined restructuring process for small businesses.

67.    The debt limit for subchapter V cases was $7.5 million when the Debtors filed for bankruptcy as a result of the Coronavirus, Aid, Relief, and Economic Security Act of 2020, and reverted to its original, statutory limit of $3,024,725 on June 21, 2024. *See* 11 U.S.C. §§ 101(51D) (defining "small business debtor").

68.    In an ordinary Chapter 11 business case, a debtor must obtain approval of a disclosure statement to ensure that creditors have adequate information to vote on the debtor's proposed plan. *See* 11 U.S.C. § 1125(a). Creditors receive the debtor's motion seeking approval of the disclosure statement and have an opportunity to object. *See* FED. R. BANKR. P. 9014. *See also* FED. R. BANKR. P. 2002(b)(1) (requiring 28-days' notice of the time to file an objection to approval of a disclosure statement). After the debtor's disclosure statement is approved, the debtor solicits votes by transmitting the disclosure statement, with the proposed plan attached, to creditors. *See* 11 U.S.C. § 1125(b)-(c). Creditors then have an opportunity to vote on, and object to, confirmation of the proposed plan. *See also* FED. R. BANKR. P. 2002(b)(2) (requiring 28-days' notice of the time to file an objection to confirmation of a plan). In summary, "once a disclosure statement is approved in a typical [C]hapter 11 case, most courts enter form orders that approve the disclosure statement; set a deadline for the plan proponent to mail the 'plan package' to creditors; set a confirmation hearing date; and set deadlines to vote on and object to the plan." 9 COLLIER ON BANKRUPTCY P 3017.2.01 (16th ed. 2024).

69.    In addition, in an ordinary Chapter 11 case, § 1127 allows the proponent of the plan to modify its plan before confirmation without leave of the bankruptcy court. A modification of the plan must comply with § 1125's requirement that claim and interest holders be given adequate information about the contents of a plan prior to soliciting their votes. *See* 11 U.S.C. § 1127(c). However, after votes have been solicited and a plan is then modified, a new disclosure statement

is not required in every case. If the proposed modification is sufficiently minor, the existing

disclosure may suffice. *See In re Concrete Designers, Inc.*, 173 B.R. 354, 356 (Bankr. S.D. Ohio

1994) (citing legislative history). *See also* FED. R. BANKR. P. 3019(a) ("If the court finds … that

the proposed modification does not adversely change the treatment of the claim of any creditor or

the interest of any equity security holder who has to accepted in writing the modification, it shall

be deemed accepted by all creditors and equity security holders who previously accepted the

plan.").

70.     In a Chapter 11 small business case, the bankruptcy court may determine that the

plan itself provides adequate information so that a separate disclosure statement is not required.

11 U.S.C. § 1125(f)(1). In such a case, the plan also serves as the disclosure statement. Bankruptcy

Rule 3016(b) provides that if a plan in a small business case is intended to provide adequate

information and no separate disclosure statement is filed, the plan "must be so designated," and

Bankruptcy Rule 3017.1, which governs bankruptcy court consideration of a disclosure statement

in a small business case, will apply.

71.     The solicitation process is further truncated in small business cases filed under

subchapter V of Chapter 11 of the Bankruptcy Code. A disclosure statement is not required unless

the bankruptcy court orders otherwise. 11 U.S.C. § 1181(b). But, in exchange, debtors in

subchapter V are expected to include certain mandatory disclosures in their plan, *see* 11 U.S.C. §

1190), and proceed quickly to confirmation. As the bankruptcy court explained in *In re Vital

Pharm, Inc*., 651 B.R. 847, 853 (Bankr. S.D. Fla. 2023) (internal quotations omitted):

> Subchapter V bankruptcy provides some powerful and cost-saving restructuring
> tools not otherwise available to Chapter 11 debtors …Those restructuring tools,
> however, came with a tradeoff. To balance the special new powers available to
> small business debtors, Congress granted creditors a very important protection: the
> requirement that a subchapter V case proceed expeditiously.
> !

20

72.     In a subchapter V case, a debtor generally must file a plan of reorganization within 90 days of the petition date. *See* 11 U.S.C. § 1189(b). While a subchapter V debtor may move to extend the 90-day deadline for filing a plan, Congress limited extensions to only those circumstances where the need for more time "is attributable to circumstances for which the debtor should not be justly held accountable." *Id.*

73.     As discussed, a separate disclosure statement is not required unless ordered by the bankruptcy court. *See* 11 U.S.C. § 1181(b). Instead, subchapter V collapses the two-part disclosure statement and plan process into one by requiring the plan to contain certain information. Section 1190(1) of the Bankruptcy Code requires a proposed plan to include (i) a brief history of the business operations of the debtor; (ii) a liquidation analysis, and (iii) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization. *See* 11 U.S.C. § 1190(1). Bankruptcy Rule 3017.2 fixes plan-related deadlines in subchapter V cases where there is no disclosure statement by requiring courts to set a plan confirmation voting deadline; a "record" date for equity and debt security holders; the confirmation hearing date and time; and a deadline for the debtor to transmit the plan voting packages to creditors.

74.     A debtor may modify a subchapter V plan at any time before confirmation. *See* 11 U.S.C. § 1193(a). As in an ordinary Chapter 11 case, "[a]fter a modification is filed with the court, the plan as modified becomes the plan." *Id*.

75.     **Procedural Objections to Confirmation**. As an initial matter, the parties objecting to confirmation raise several procedural objections to consideration of the Fourth Amended Plan. First, they object that the Fourth Amended Plan was untimely. Next, they object that the Debtors failed to provide reasonable notice of the Fourth Amended Plan, which was filed in the midst of the confirmation hearing, with insufficient time to assert their objections. In addition, they object

that the Debtors did not solicit votes on the Fourth Amended Plan, which made material and adverse changes to the treatment of creditors.

76.     **Deadline to File a Plan**. As discussed, a subchapter V case is intended to proceed expeditiously, and debtors are statutorily required to file a plan within 90 days of the petition date. The Court may extend the deadline "if the need for an extension is attributable to circumstances for which the debtor should not justly be held accountable." 11 U.S.C. § 1189(b). A debtor bears the burden of proof to establish that an extension of time to file a plan is warranted. *See In re Online King LLC*, 629 B.R. 340, 346 (Bankr. E.D.N.Y. 2021).

77.     In this case, the Court granted a motion by the Debtors to extend the original statutory deadline of June 18, 2024, to August 19, 2024. Despite the extension, the original plan filed by the Debtors on August 19, 2024, was materially incomplete and did not contain all the elements required by § 1190 of the Bankruptcy Code. Specifically, the Debtors' initial plan lacked a liquidation analysis.

78.     After receiving a second extension of the deadline to file a plan, the Debtors filed the First Amended Plan on October 16, 2024. The Court scheduled a confirmation hearing for December 3rd, which the Court continued to a Second Confirmation Hearing on December 6th at the Debtors' request, which the Court continued again to a Third Confirmation Hearing on December 9th at the Debtors' request. At the Third Confirmation Hearing on December 9, 2024, the Debtors announced that they had not obtained a commitment for exit financing. As a result, the Debtors were unable to prove the requisites for confirmation, including feasibility.

79.     In light of the Debtors' repeated inability to go forward with confirmation, as well as their repeated, last-minute continuances, and what was supposed to be a limited plan amendment (*i.e.*, to obtain a financing commitment from their proposed lender and provide exit financing

details), the Court granted the Debtors one final opportunity to amend their plan by December 16, 2024.

80.     The Debtors filed their Second Amended Plan on December 16, 2024. But then, beyond the final plan amendment deadline of December 16th set by the Court, the Debtors filed a Third Amended Plan on January 6, 2025 – the eve of the January 7th confirmation hearing. The Debtors did not request or receive retroactive relief from the December 16th deadline to file an amended plan.

81.     The Debtors then filed a Fourth Amended Plan on January 9, 2025, in the midst of the confirmation hearing, that materially altered their cash flow projections and materially reduced the treatment of creditors. Again, the Debtors did not request or receive retroactive relief from the December 16th deadline to file a plan.

82.     The Debtors filed the Third Amended Plan and the Fourth Amended Plan without addressing whether grounds to extend the December 16th deadline. The provision in § 1189(b) that the deadline to file a plan may be extended only "if the need for an extension is attributable to circumstances for which the debtor should not justly be held accountable" is clearly a higher standard than the "for cause" standard for extensions in an ordinary Chapter 11 case set forth in Bankruptcy Code § 1121(d)(1) (governing extensions of a non-subchapter V debtor's exclusive period to file a Chapter 11 plan). However, bankruptcy courts in subchapter V cases have taken different approaches to the determination of whether circumstances are beyond a debtor's control. *See generally* 8 COLLIER ON BANKRUPTCY P 1189.03 (16th ed. 2024).

83.     In this case, the Debtors failed to carry their burden to establish that external factors beyond their control necessitated an extension of the December 16th deadline to file a plan. The Debtors filed these cases less than two months after their prior cases were dismissed because they

could not confirm a plan. The Debtors repeatedly failed to meet plan-related deadlines even after the Court granted extensions. The IRS moved to dismiss the Debtors' cases due to the non-payment of post-petition trust fund taxes, and Alleon and KRS objected to the Debtors' last-minute filing of the Third and Fourth Amended Plans. The Debtors cash flow projections changed significantly, and for the worse, during the confirmation hearing. Further, there were no extraordinary or exigent circumstances that justified the last-minute filing of the Third Amended Plan on January 6, 2025, or the Fourth Amended Plan on January 9, 2024.

84.    While the Fourth Amended Plan "became the plan" under Bankruptcy Code § 1193, the Fourth Amended Plan did not relate back to the timely filed Second Amended Plan for notice purposes. The Fourth Amended Plan did not make minor, insignificant changes. The Fourth Amended Plan materially modified the Debtors' cash flow projections, which is a statutorily required element of plans in subchapter V cases, among other things. The Fourth Amended Plan was filed too late in violation of § 1189(b), and, as discussed below, without sufficient notice to creditors.

85.    **Reasonable Notice**. While a debtor may modify a plan prior to confirmation, the modified plan must nevertheless comply with the notice requirements of Bankruptcy Rule 2002(b)(2). Bankruptcy Rule 2002(b)(2) generally requires 28-days' notice by mail of "the time to file an objection to – and the time of hearing to consider whether to confirm – a Chapter 9 or 11 plan." When the plan modifications are immaterial, the original notice of the plan prior to modification may be sufficient. However, when a modification is material, and the modified plan becomes "the plan" pursuant to § 1193(a), that modified plan must comply the noticing requirements of Bankruptcy Rule 2002(a).

24

86.     The Debtors filed the Fourth Amended Plan on January 9, 2025. The Debtors

materially and adversely altered the proposed treatment of creditors. In addition, the cash flow

projections in the Fourth Amended Plan, which § 1190(1) requires as part of the disclosures that

are combined with a subchapter V plan, were materially different than the projections the Debtors

had previously provided to creditors. Section 1190(1)(c) requires projections to show "the ability

of the debtor to make payments under the proposed plan." 11 U.S.C. § 1190(1)(c).

87.     Where a debtor materially alters the projections in a subchapter V case, as in this

case, creditors are entitled to notice under Bankruptcy Rule 2002(b) to object to the plan's

compliance with § 1190. The Debtors failed to provide such notice.

88.     **Solicitation of Ballots**. In an ordinary Chapter 11 case, "§§ 1129(a)(8), and (10)

implicitly impose a voting requirement as either all impaired classes must approve the plan to

confirm a consensual plan, or at least one impaired creditor must approve to confirm a

nonconsensual plan." *In re Samurai Martial Sports, Inc.*, 644 B.R. 667, 690–91 (Bankr. S.D. Tex.

2022). In a subchapter V case, where (8) and (10) are inapplicable, solicitation is nevertheless

required to determine whether a plan is to be confirmed as consensual under § 1191(a) or as non-

consensual under § 1191(b). *Id.*

89.     In this case, the Debtors previously solicited votes on the First Amended Plan. The

Debtors filed a ballot summary showing that creditors objected to the First Amended Plan. Thus,

the present case is distinguishable from *In re Samurai Martial Sports, Inc.*, 644 B.R. 667 (Bankr.

S.D. Tex. 2022), cited by Alleon, where there was no solicitation at all.

90.     Under the circumstances of the present case, where the Debtors solicited votes on

First Amended Plan as required by Bankruptcy Rule 3017.2, and where the Debtors are seeking

confirmation of their plan, as amended, as a non-consensual plan under § 1191(b), the Court finds

that the Debtors were not required to re-solicit the Fourth Amended Plan. Nonetheless, as previously discussed, creditors were entitled to reasonable notice of the modifications to their treatment contained in the Fourth Amended Plan in sufficient time to allow them to assert objections to confirmation of that modified Plan. Here, notice was wholly inadequate.

91.     **Substantive Objections to Confirmation**. Turning to creditors' substantive objections to the Fourth Amended Plan, KRS, Alleon and the IRS raise specific objections to their treatment. More generally, they object that the Fourth Amended Plan cannot be confirmed because the Debtors failed to comply with all the applicable provisions of Chapter 11 (11 U.S.C. § 1129(a)(1)-(2)), the Debtors have not proposed the Fourth Amended Plan in good faith (11 U.S.C. § 1129(a)(3)), the Fourth Amended Plan is not feasible, (11 U.S.C. § 1129(a)(11)), and the Fourth Amended Plan is not fair and equitable (11 U.S.C. § 1191(b)).

92.     The Debtors bear the burden of proof by a preponderance of the evidence to ensure their plan complies with the applicable provisions of §§ 1190, 1191 and 1129(a) of the Bankruptcy Code. *See In re Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. 793, 808 (Bankr. W.D. Tex. 2024) (collecting authority). The Debtor's burden under § 1191 includes proving that all of the applicable requirements of § 1129(a) have been satisfied and, if confirmation of a nonconsensual plan is sought pursuant to § 1191(b), also proving that the subchapter V plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under and has not accepted the subchapter V plan. Ultimately, as discussed below, the Debtors failed to carry their evidentiary burden.

93.     **Compliance With Applicable Provisions of Chapter 11**. In order for a bankruptcy court to confirm a plan, § 1129(a)(1) requires the plan to comply with all applicable provisions of Chapter 11, and § 1129(a)(2) of the Bankruptcy Code requires that "[t]he proponent

of the plan comply with the applicable provisions of this title." *See* 11 U.S.C. § 1191(a) (requiring that a plan meet all the requirements set forth in 11 U.S.C. § 1129(a) other than paragraph (15) of that section). Among those provisions are the content requirements set forth in § 1190. The Debtors in this case did not meet those requirements with their original plan.

94.     Here, the original plan filed by the Debtors was materially incomplete and did not contain all the elements required by § 1190(1) of the Bankruptcy Code. It appears to have been a placeholder plan rather than a serious attempt at reorganization. Their Fourth Amended Plan, which the Debtors are seeking to confirm, was filed in the midst of the confirmation hearing and in violation of the deadlines set forth in § 1189(b) of the Bankruptcy Code and this Court's orders.

95.     The Debtors failed to comply with all the plan- and disclosure- related requirements of the Bankruptcy Code and Rules as required by 11 U.S.C. § 1129(a)(1)-(2). Moreover, even if notice to creditors could be remedied, even if the Debtors' original plan had been substantially complete, and even if the Debtors had received an extension of the deadline to file their Fourth Amended Plan, other issues in the Fourth Amended Plan prevent confirmation.

96.     **Good Faith Requirement**. Section 1129(a)(3) of the Bankruptcy Code requires that a debtor's plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start. *In re Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir. 1985). "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *Id.*

27

97.     Here, the Debtors filed for bankruptcy only two months after their prior cases were dismissed because they could not confirm a plan. The Court afforded the Debtors numerous extensions of plan-related deadlines in these cases. The Debtors repeatedly, and materially, altered their cash flow projections – which is a statutorily required element of plans in subchapter V cases – and those projections contained material errors and omissions. For example, between the start of the confirmation hearing on January 7, 2025, and the continued confirmation hearing on January 13, 2025, the Debtors discovered they had overestimated their annual QIPP payments by approximately $700,000 and had overlooked approximately $1,200,000 in receivables.

98.     The Debtors filed these cases to maintain control of the Facility and delay a receivership or liquidation. Their financial position did not improve but, instead, deteriorated after filing for bankruptcy. Over the course of these cases, the Debtors accrued significant administrative expenses, turning what looked like cases that were marginal, at best, into cases that looked administratively insolvent.

99.     During these cases, the Debtors accrued hundreds of thousands of dollars in liability to the IRS by failing to pay the quarterly trust fund taxes withheld from their employees' paychecks for Social Security, Medicare, and federal income taxes. The Debtors, having withheld the taxes (or at least represented to their employees that they had withheld the taxes), apparently did not keep the funds to pay the IRS but, instead, used the funds to pay other obligations. And instead of taking corrective action after the issue was raised in the bankruptcy proceedings, the Debtors continued to accrue more liability for the trust fund taxes.

100.     The Debtors also accrued a debt of at least $420,000 to the Hospital District, which the parties memorialized in an agreed order and settlement. In addition, the Debtors have accrued unpaid attorneys' fees in an "estimated" amount of at least $800,000.

101.    All the post-petition debt accrued by the Debtors necessitated exit financing. Part VII of the Fourth Amended Plan states that the $3 million in exit financing would be used to cure the defaults under the lease of the Facility, pay administrative expense claims, and to "fund the [r]eorganized debtor's working capital and general corporate needs." Although the Debtors' reasonable attorneys' fees would be an administrative expense, to the extent allowed by the Court, the estimated fees were so high that the Debtors proposed to delay payment to some point in the future upon mutually agreeable terms.

102.    Even if Renew were willing and able to fund the proposed exit financing, the Debtors' Fourth Amended Plan lacks an adequate means of implementation because it is based on a fallacy, among other deficiencies. *See In re Patriot Place, Ltd.*, 486 B.R. 773, 809 (Bankr. W.D. Tex. 2013) (holding that the absence of an adequate means of implementation demonstrates lack of good faith). The Debtors' Fourth Amended Plan refers to the receivables generated by the Facility as belonging to RH-Seguin. The Debtors also propose using the receivables generated by the Facility as security for exit financing. As discussed, however, RH-Seguin no longer owns the Facility or the receivables generated through its operation. RH-Sequin manages the Facility as an independent contractor for the Hospital District and has certain rights to payment under the Management Agreement.

103.    Mr. McPike repeatedly testified that RH-Seguin is the Hospital District's "partner" and still owns the receivables generated through the operation of the Facility. His testimony regarding RH-Seguin's legal rights under the Management Agreement was not supported by documentary evidence. Indeed, his testimony was contradicted by the plain terms of the Management Agreement and the transfer of RH-Seguin's licenses to the Hospital District.

104.     The Fourth Amended Plan did not seek to resolve the operational issues that led to
the Debtors' most recent bankruptcy filings. The primary purpose of the Fourth Amended Plan
was to obtain financing to pay $3 million in administrative expenses. The Debtors were not
proposing a "fresh start" in the Fourth Amended Plan, but merely to pay the expenses associated
with their latest bankruptcy filings.

105.     Under the totality of the circumstances, the Court finds that the Debtors failed to
carry their burden to establish that they proposed the Fourth Amended Plan in good faith.

106.     **Feasibility Requirement**. In addition, to obtain confirmation of their
reorganization plan, the Debtors must show by a preponderance of the evidence that their plan is
feasible, meaning that it is "not likely to be followed by the liquidation, or the need for further
financial reorganization." 11 U.S.C. 1129(a)(11), 1191(b); *Save Our Springs (S.O.S) Alliance Inc.,*
632 F.3d 168, 172 (5th Cir. 2011). Though a guarantee of success is not required, the bankruptcy
court should be satisfied that the reorganized debtor can stand on its own two feet. *See United*
*Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 378, 108 S.Ct. 626,
98 L.Ed.2d 740 (1988).

107.     Here, the Debtors failed to carry their burden to establish that the Fourth Amended
Plan is feasible. The Fourth Amended Plan relies on a $3 million credit facility, but the Debtors
failed to show that Renew was willing to and capable of funding the exit loan on the effective date.
*See, e.g. Save Our Springs,* 632 F.3d 168 at 173 n.8 ("Many courts have found debtors' statements
that funding is forthcoming to be insufficient in the absence of concrete evidence that the
contributors are willing to give and capable of giving"); *In re Ralph C. Tyler, P.E., P.S., Inc.*, 156
B.R. 995, 997 (Bankr. N.D. Ohio 1993) ("At the point of confirmation, th[e] source of funding

must be shown to be firm as it goes directly to feasibility…. Without evidence of a firm commitment of financing, this Plan does not meet the feasibility requirement.").

108.    The Loan Documents were sufficiently ambiguous to create doubt that the exit financing would close. For example, the Court was unable to determine whether the debt ratios in the Loan Documents will be clear and not trigger a default on the first day of the loan term. The Loan Documents also offered Renew a pledge of all securities evidencing an ownership interest in the Debtors. Notwithstanding Mr. McPike's testimony that the equity pledge provision would be removed from the Loan Documents, Mr. Renda testified that he would not agree to remove the equity pledge provision.

109.    In addition, to the extent that the Loan Documents required the Debtors to pledge accounts receivable as collateral in excess of their authority to do so under Section 2.3.3 of the Management Agreement, it was not clear from the Loan Documents that funding would have closed. Section 2.3.3 of the Management Agreement prohibits RH-Seguin from pledging or providing a security interest "in any assets of Hospital District" but provides that that RH-Seguin "may pledge a security interest in the Facility Operating Account as collateral for working capital …." The security offered by the Debtors in the Loan Documents appeared to exceed this limited authority. Thus, even if the exit financing closed, the pledging of such accounts receivable could trigger a default under the Management Agreement.

110.    As the Court explained during the confirmation hearing, RH-Seguin's authority to pledge a security interest in the Facility Operating Account, which may hold the proceeds of the Hospital District's Depository Account, is not the same as authority to grant a security interest in

the Hospital District's receivables from operating the Facility.[7] And RH-Seguin's security interest in the Hospital District's Depository Account, which secures the Hospital District's obligations to RH-Seguin under the Management Agreement, does not give the Debtors an ownership interest in the Depository Account or a right to pledge the account to secure RH-Seguin's obligations to an exit lender.

111.    At the continued confirmation hearing on January 13, 2025, the Debtors presented some evidence that Mr. Renda owned stock. There was no evidence that Renew, the proposed lender, had any assets.

112.    The Debtors' Fourth Amended Plan also failed to acknowledge that RH-Seguin had entered into a new business model on the eve of bankruptcy. The Debtors no longer owned and operated the Facility or owned the accounts receivable generated through the operation of the Facility – rather, RH-Seguin managed the Facility and was entitled to certain payments from the Hospital District under the terms of the Management Agreement. To secure the Hospital District's obligations to RH-Seguin, paragraph 7.2 of the Management Agreement grants RH-Seguin a security interest in the Depository Account.[8]

---

[7] At the confirmation hearing, counsel for the Debtors argued that the terms of the settlement agreement the Debtors entered into with the Hospital District in September 2024 (and amended in October 2024) either granted the Debtors an interest in the Hospital District's accounts receivable or should be read as acknowledging that such an interest exists under the terms of the Management Agreement. The Hospital District has not agreed to this interpretation of the Management Agreement or the settlement agreement. The Management Agreement is premised on the prior transfer of operations to the Hospital District. Further, the settlement agreement between the Hospital District and the Debtors did not state that the Hospital District intended to amend the Management Agreement to allow RH-Seguin to pledge an interest in the accounts receivable generated through the operation of the Facility in the future after the Debtors satisfied the terms of the settlement agreement. The settlement agreement simply quelled the dispute, temporarily (and in the Hospital District's favor inasmuch as the Debtors agreed the accounts receivable belonged to the Hospital District for purposes of the settlement agreement), so that these cases could continue.

[8] Notably, if RH-Seguin owned the accounts receivable generated from the operation of the Facility (as Mr. McPike testified and counsel for the Debtors argued to this Court), Section 7.2 of the Management Agreement would provide RH-Seguin a lien on its own assets as security.

113.   RH-Seguin does not have a long-standing history as the manager of a state-owned nursing facility. The Debtors also were unfamiliar with QIPP. At the January 7, 2025, hearing to consider confirmation of the Third Amended Plan (filed on January 6, 2025), Mr. McPike's testimony about the amount of QIPP revenue the Debtors would receive was mistaken. RH-Seguin entered into a stipulation with the Hospital District after Mr. McPike was cross-examined, agreeing that the QIPP revenue would be less than half the amount described in Mr. McPike's testimony.

114.   After the dismissal of their prior cases in February 2024, the Debtors filed for bankruptcy again less than two months later. The Debtors did not have a plan ready to file nor any agreement from their primary creditors that they could or should attempt another reorganization through bankruptcy. The Debtors requested, and received, an extension of time to file a plan of reorganization. The Debtors started with an initial plan in August 2024 that purported to be funded through their operations and would pay creditors in full, then amended their plan in October 2024 to one that required $1.8 million in exit financing but would pay creditors in full, then amended their plan again in December 2024 to one that required $3 million in exit financing but would pay creditors in full, then amended their plan again in January 2025 to one that required $3 million in exit financing but would now would pay unsecured creditors only 20% of their claims.

115.   The Debtors failed to pay the IRS any trust fund taxes during bankruptcy, and the Fourth Amended Plan reflects that the Debtors would need to use a portion of the exit financing to pay the IRS for this liability that accrued during the pendency of the bankruptcy cases. The Debtors also incurred a $420,000 liability to the Hospital District during these cases. The Debtors' material changes to their projections, especially at the last minute, raises serious questions about whether the projections are reasonable. Further, the Debtors' speculative and erroneous cash flow projections do not support a prediction of future performance. *See Save Our Springs,* 632 F.3d at

172; *Matter of Canal Place Ltd. P'ship,* 921 F.2d 569, 579 (5th Cir. 1991). This Court does not require a guaranty of success, but the Debtors failed to provide reasonable assurance that the Fourth Amended Plan was workable and had a reasonable likelihood of success. *Matter of T–H New Orleans Ltd. P'ship,* 116 F.3d 790, 801 (5th Cir. 1997) (a bankruptcy e bankruptcy court "need not require a guarantee of success ..., [o]nly a reasonable assurance of commercial viability is required.").

116.    The Court gave the Debtors every opportunity to present a confirmable plan. The Court extended the original deadline to file a plan to August 19, 2024. The Court allowed the Debtors to file another amended play by October 18, 2024, after several affiliated cases converted to Chapter 7. It was apparent the confirmation hearing on December 3, 6 and 9, 2024, that the Debtors had no exit financing. The Court nonetheless allowed the Debtors another extension to December 16, 2024, to amend their plan to obtain an exit financing commitment.

117.    After the Court afforded the Debtors additional time to secure and prove up their exit financing, the Debtors filed supplemental exit financing documents that failed to address all the averments in paragraph 4(a) of the Lift Stay Order. The Debtors also filed a Third Amended Plan on the day before the January 7th confirmation hearing. The Debtors then filed the Fourth Amended Plan in the midst of the confirmation hearing. Despite all these extensions and amendments, authorized and unauthorized, the Debtors failed to meet their burden on feasibility.

118.    **Fair and Equitable Requirement**. Next, a non-consensual plan can be confirmed in subchapter V only if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C.  §§ 1191(b), 1129(b)(1).

34

119.    Section 1191(c) defines "fair and equitable" with respect to other claims and interests to mean that the subchapter V plan, as of its effective date, either: (a) provides that all of the debtor's "projected disposable income," be received during the 3-5 year term of the subchapter V plan, or that (b) the value of property to be distributed under the plan is not less than the debtor's projected disposable income over the term of the subchapter V plan. 11 U.S.C. § 1191(c)(2)(A), (B). Section § 1191(c) also requires that, for a subchapter V plan to be fair and equitable, the debtor must also show that it will (or a reasonable likelihood that it will) be able to make all payments called for under the plan and that "the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made."

120.    Here, for the same reasons the Debtors' Fourth Amended Plan is not feasible, the Debtors' projections are unreliable. The Debtors failed to establish that the § 1191(c) requisites have been met.

121.    The Court, therefore, concludes that the Debtors failed to establish that their plan was fair and equitable or that there is a reasonable likelihood the Debtors would be able to make all plan payments. *See* 11 U.S.C. § 1191(c)(3)(B)(i).

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that confirmation of the Fourth Amended Plan is **DENIED**.

Signed on 03/04/2025

*Brenda T. Rhoades*          SD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE