**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **REMARKABLE HEALTHCARE, LLC** | § | **CASE NO. 24-40611** |
| **and REMARKABLE HEALTHCARE OF** | § | **(CHAPTER 11)** |
| **SEGUIN, L.P.,** | § | |
| | § | **(Jointly Administered)** |
| **DEBTORS.** | § | |
| | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER
REGARDING FINAL FEE APPLICATION OF GUTNICKI LLP**

Before the Court is the Second and Final Fee Application of Gutnicki LLP (**"Gutnicki"**) for approval of $586,798.02 in fees and $22,621.62 in expenses in connection with its representation of the Debtors in these jointly administered Subchapter V Chapter 11 cases. KRS Seguin, LLC (**"KRS"**) objected, arguing that the requested fees are excessive considering the size of these cases, the absence of any meaningful results, and the advancement of untenable legal theories. The Court held a contested hearing on May 21, 2025, and took the matter under advisement.

For the reasons set forth below, the Court sustains KRS's objections in part. The attorney's fees are reduced to a final allowed amount of $185,325 plus $22,621.62 in expenses. The Court notes at the outset, however, that this determination is largely academic. There is substantially no money in these estates, and no distribution on account of these fees is likely to occur.

## BACKGROUND

### A Serial History of Financial Distress

These were the Debtors' third bankruptcy filings since 2018. Remarkable Healthcare of Carrollton, LP ("**RH-Carrollton**"), Remarkable Healthcare of Dallas, LP ("**RH-Dallas**"),

1

Remarkable Healthcare of Fort Worth, LP ("**RH-Fort Worth**"), and Remarkable Healthcare of Seguin, LP ("**RH-Seguin**") each operated skilled nursing facilities. These entities, along with Remarkable Healthcare, LLC ("**RH-LLC**"), filed their first Chapter 11 cases in February 2018 [Lead Case No. 18-40295] and confirmed a plan of reorganization in May 2019.[1] They filed again in November 2023 under Subchapter V of Chapter 11 [Lead Case No. 23-42098], but that case ended in February 2024 after the Debtors moved to dismiss. Their secured lender (Alleon Capital Partners, LLC) and landlord (KRS) requested that the dismissal be with prejudice to re-filing for 180 days, and the Court granted that condition [Lead Case No. 23-42098, Docket No. 103].

The Debtors filed the present cases on March 20, 2024—the day after the Court denied their motion to vacate the dismissal order from the second filing and denied their Bankruptcy Rule 9011 sanctions motion against Alleon [Lead Case No. 23-42098, Docket Nos. 108-110]. They arrived in bankruptcy in an acute financial crisis with no cash to make payroll, no post-petition financing arranged, and with rent in arrears at all facilities.

**The CHOW Transaction and Immediate Collapse of the DFW Facilities**

Before the present filing, the Debtors had pursued a change-of-ownership ("**CHOW**") transaction designed to access incentive payments under the Texas Quality Incentive Payment Program ("**QIPP**"). On March 1, 2024, in order to access the QIPP, the Debtors transferred their Medicare and Medicaid provider numbers and agreements to the West Wharton Hospital District (the "**Hospital District**") and entered into a Management Agreement under which the Debtors

---

[1] Notably, in the Chapter 11 bankruptcy cases filed by the Debtors in 2018, the Court awarded their counsel $395,138.79 in total compensation [Case No. 18-40295, Docket No. 388]. Those cases involved several additional entities, and, after 15 months in bankruptcy, the Debtors achieved confirmation of a joint plan of reorganization.

would continue to operate the facilities as managers for the Hospital District.[2] The CHOW transaction temporarily disrupted collections by creating a "CHOW hold" during which receivables accumulated but could not be accessed.

The DFW facilities (Carrollton, Dallas, and Fort Worth) failed almost immediately. By March 25, 2024—five days after filing—those three Debtors were unable to make payroll, threatening patient safety. The Court lifted the automatic stay as to the DFW Debtors and KRS provided $439,179.84 in emergency financing to fund March payroll, followed by a second advance of $224,600 in April. [Lead Case No. 24-40605, Docket Nos. 34 and 203]. Despite this lifeline, the DFW Debtors remained unable to sustain operations. The Fort Worth facility lost its provider agreements on April 18, 2024. All three DFW facilities had transitioned to new management by May 13, 2024. The DFW Debtors initially pursued a liquidating plan but converted to Chapter 7 on September 30, 2024 [Lead Case No. 24-40605, Docket Nos. 404 and 423]. The Chapter 7 trustee found the estates administratively insolvent, and their cases were dismissed on December 18, 2024 [Case No. 24-40605, Docket No. 464].

**The Seguin Debtors' Protracted and Failed Reorganization**

Only the Seguin facility (operated by RH-Seguin) and the affiliated holding company (RH-LLC) continued to attempt to reorganize through Chapter 11. Their reorganization effort extended for a period of 13 months, from the petition date in March 2024 through dismissal on April 1, 2025. It was marked throughout by an inability to fund basic obligations, repeated emergency

---

[2] Nursing facilities throughout Texas have transferred ownership to government entities like hospital districts, which then contract with a nursing home operating company to run the facilities, in order to participate in the QIPP. *See, e.g.*, https://www.kxan.com/investigations/obscure-program-sends-big-money-to-texas-nursing-homes-amid-pandemic-is-it-protecting-residents/. *See also* 1 TEX. ADMIN. CODE § 353.1302(b)(1) (discussing applications for a change in ownership).

hearings, a fractious relationship with KRS and Alleon, multiple plan amendments, and, ultimately, the failure to confirm any plan.

The most significant operational problem was the Seguin Debtors' failure to remit post-petition Form 941 federal payroll taxes. By the time the IRS filed a motion to dismiss in December 2024, RH-Seguin had accumulated $296,523.22, and RH-LLC had accumulated $108,073.10, in delinquent trust fund taxes, including interest and penalties, totaling more than $404,000. This failure was not newly discovered. Testimony from the Seguin Debtors' Chief Operating Officer ("**COO**") at a July 22, 2024, hearing had already revealed that the Debtors had been paying only net wages without withholding taxes, a practice that had begun before bankruptcy.

The accumulating payroll tax liability was grounds for dismissal or conversion of the Debtor's cases. *See* 11 U.S.C. § 1112(b)(4)(I). Moreover, the Debtors' failure to pay their post-petition debts to the IRS rendered any plan unconfirmable unless remedied. *See* 11 U.S.C. §§ 507(a)(1), 1129(a)(1) and 1191(a). Although Gutnicki represented to the Court that it had agreed that its administrative claim for fees and costs could be paid by the reorganized Debtors following the effective date of a confirmed plan, no other administrative claimant made such a concession during the pendency of the cases.

In addition to their accumulating liability to the IRS, the Seguin Debtors also failed to pay post-petition rent to KRS. They filed multiple plans (ultimately a Fourth Amended Plan), with each iteration requiring an increasing amount of exit financing that the Debtors were never able to reliably secure. The Court denied confirmation on January 13, 2025, after the Debtors filed a stipulation during the confirmation hearing correcting their projected QIPP revenue downward from $1,262,194 annually to $503,050.94. This stipulation directly contradicted testimony their

4

COO had previously provided during the confirmation hearing. The Court dismissed the cases on April 1, 2025, on the IRS's motion.

## Gutnicki's Retention and Fee Request

Gutnicki was retained as bankruptcy counsel on April 19, 2024, and its employment was approved by order entered May 17, 2024 pursuant to § 327 of the Bankruptcy Code. RH-LLC paid Gutnicki pre-petition retainers totaling $58,750 to prepare and file five Chapter 11 cases.

Gutnicki's final fee application seeks more than $580,000 in fees for 1,165.5 hours of work attributable to the Seguin Debtors (including a pro-rata allocation of the period jointly administered with the DFW Debtors) and $22,621.62 in expenses, totaling $609,419.64. Gutnicki represents that it has already voluntarily reduced its fees by $204,289, and that its lead attorney, Elizabeth Boydston, did not bill most of the time she spent on the cases. The Court's analysis of Gutnicki's time records allocates the Seguin Debtors' requested fees across the following categories in the following amounts:[3]

| Category | Amount |
|---|---|
| Case Administration | $118,700 |
| Asset Analysis and Recovery | $1,700 |
| Relief from Stay / Adequate Protection | $45,000 |
| Assumption/Rejection of Leases | $6,350 |
| Contested Matters | $71,050 |
| Financing / Cash Collections | $57,200 |
| Claims Administration and Objections | $67,200 |
| Plan and Disclosure Statement | $214,750 |
| **TOTAL** | **$581,950** |

---

[3] The Court was unable to locate an express disclosure of the amount Gutnicki is seeking for each category in its final fee application, which hindered the Court's analysis. The Court's own tally of the amounts billed to each category is within $5,000 of the total amount requested by Gutnicki.

## LEGAL STANDARD

Section 330(a)(1) of the Bankruptcy Code authorizes the Court to award a professional employed under § 327 "reasonable compensation for actual, necessary services rendered." 11 U.S.C. § 330(a)(1). In evaluating reasonableness, the Court considers the factors enumerated in § 330(a)(3)—including time spent, rates charged, necessity of the services, and results obtained—as well as the twelve *Johnson* factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714, 717 (5th Cir. 1974). Reasonableness is assessed prospectively. The question is whether the work was necessary to the administration of the case or reasonably likely to benefit the estate at the time it was performed. *In re Woerner*, 783 F.3d 266, 276 (5th Cir. 2015).

## ANALYSIS

### A. Case Context: Small Cases with Poor Prospects from the Start

Subchapter V of Chapter 11 was designed to reduce the cost and complexity of small business reorganizations. *See, e.g.*, *In re Vital Pharm, Inc.*, 651 B.R. 847, 853 (Bankr. S.D. Fla. 2023). There is no separate disclosure statement requirement, U.S. Trustee fees are waived, and the statutory deadline for plan filing is ninety days. *See* 11 U.S.C. §§ 1181(b) and 1189(b), 28 U.S.C. § 1930(a)(6). The Seguin Debtors' scheduled liabilities totaled approximately $5.5 million,

6

with Alleon holding a secured claim against each Debtor and with KRS holding a claim for unpaid rent.[4] These were not especially large or complex cases.

Moreover, these were not cases presenting novel issues. The Debtors had initiated two prior bankruptcies, and the principal legal and factual disputes with Alleon and KRS over collateral and unpaid rent, respectively, were typical of commercial bankruptcy practice. The incremental complexity introduced in this case (primarily the CHOW/QIPP structure) presented discrete questions that did not require the scope of attorney resources reflected in the billing records.

Gutnicki's attorneys are qualified and experienced bankruptcy practitioners. They seemed passionately committed to achieving plan confirmation for their clients. But billing records of the kind at issue here (involving extensive multi-attorney involvement, repeated duplicative efforts, and the pursuit of untenable positions) are not redeemed by attorney quality. The Court assesses each category of work against this backdrop.

**B. Case Administration ($118,700 requested)**

Gutnicki seeks $118,700 for "case administration." A review of the underlying time entries reveals that a substantial portion of this category was actually devoted to preparing for plan confirmation rather than routine administrative matters. For example, on December 4 and 5, 2024, three attorneys billed a combined total of approximately 18 hours and $8,100 to draft and revise a confirmation hearing PowerPoint, with entries allocated to "case administration" rather than to the plan category.

---

[4] The Debtors elected to file under Subchapter V of Chapter 11, which, at the time, had a temporarily increased debt limit of $7.5 million due to the Coronavirus Aid, Relief, and Economic Security Act enacted in March 2020. *See* 11 U.S. C. § 101(51D) (defining "small business debtor"). In their bankruptcy schedules, RH-LLC reported total liabilities of $2,413,595.94 [Case No. 24-40611, Docket No. 24], and RH-Seguin reported total liabilities of $3,143,242.47 [Case No. 24-40612, Docket No. 23].

The Court recognizes that some overlap between categories is inevitable as disputes can be multi-faceted. However, even setting aside the miscategorization issue, the total billed for case administration far exceeds what is reasonable for jointly administered Subchapter V cases of this size. This conclusion is reinforced by the Debtors' retention of a third party as a claims, noticing, and solicitation agent, which performed routine functions that would otherwise have been handled by counsel. The Court reduces this category by 75% and allows $29,675.

**C. Financing/Cash Collections, Claims Administration, and Contested Matters ($195,450 requested)**

Gutnicki billed $57,200 for financing and cash collection matters, $67,200 for claims administration and objections, and $71,050 for contested matters, totaling $195,450. These three categories present overlapping concerns, including excessive staffing, duplication of effort, and the pursuit of services that were not reasonably likely to benefit the estate.

First, the docket is marked by a steady stream of emergency motions and hearings as well as several requests by the Seguin Debtors to sanction Alleon, KRS, and the Hospital District. While bankruptcy cases, particularly those involving a vulnerable population, may require prompt action, the frequency and nature of these filings did not reflect case complexity. Instead, they reflect the absence of a coherent and viable path forward.

At the center of much of this activity was the Debtor's position that the CHOW constituted a non-substantive change. The Seguin Debtors did not dispute that they had transferred their licenses and provider agreements to the Hospital District, but they nevertheless maintained that they retained ownership of the receivables generated from the operation of the Seguin facility. Counsel for the Debtors likened the Hospital District's obligation to pay RH-Seguin under the Management Agreement to a "beneficial trust" with respect to the funds held in the Hospital District's accounts. That theory conflated ownership of the receivables with a contractual right to

8

payment under the Management Agreement. The Hospital District rejected that interpretation and did not agree that the Debtors owned the receivables or could pledge the receivables as collateral for exit financing. As a result, a substantial portion of the work performed in these categories was premised on a legal theory that was, at best, unlikely to succeed.

The billing records reflect that multiple attorneys were working on discrete contested matters, including substantial attorney overlap on objections to the claims of KRS and Alleon. Four attorneys billed approximately $34,000 on the KRS claim objection alone. Two attorneys spent more than 15 hours on the Alleon claim objection despite the relatively focused nature of the disputes. Gutnicki also expended approximately 15 hours responding to the IRS Motion to Dismiss, even though the Debtors did not dispute their failure to pay post petition Form 941 taxes. The contested matters category further includes time spent pursuing a sanctions motion against KRS based on a purported Rule 11 Agreement that the Court determined did not exist.

While competent representation is expected, advancing legal positions that were, at best, long shots does not justify the excessive staffing and hours claimed. Section 330 also does not permit compensation for services that were unnecessarily duplicative or not reasonably likely to benefit the estate. Nor does it permit recovery for inefficiencies stemming from overstaffing or from litigation strategies that rest on untenable legal positions. The Court reduces these combined categories by 75% to $48,862.50 (a total reduction of $146,587.50), reflecting excessive multi-attorney staffing, duplicative work, and pursuit of unreasonable or untenable positions.

**D. Plan and Disclosure Statement ($214,750 requested)**

The largest single category is plan-related work, for which Gutnicki seeks $214,750. This is the area where the Court's concerns are most acute.

The Seguin Debtors failed to pay post-petition Form 941 payroll taxes during the entirety of these cases. Payment of taxes is a prerequisite to plan confirmation under both § 1129 and § 1191 of the Bankruptcy Code, and an ongoing failure to pay taxes is independently a basis for dismissal. *See* 11 U.S.C. § 1112(b)(4)(I). The July 22, 2024 hearing put counsel on notice that the Debtors' pre-petition practice of withholding taxes without remitting them was potentially continuing post-petition. Gutnicki nonetheless devoted hundreds of hours to plan confirmation efforts from August 2024 through January 2025, including four amended plans, multiple exit financing negotiations, and contested confirmation hearings, while the tax delinquency grew to over $404,000.

The prospective reasonableness standard does not require certainty of failure before counsel can be held to have exceeded the bounds of compensable work. However, where a debtor has failed to achieve a positive cash flow sufficient to fund a reorganization, where a debtor lacks a firm grasp of its finances, and where a known and unresolved condition such as the nonpayment of trust fund taxes bars confirmation, continuing to prosecute a confirmation effort consumes estate resources while providing little or no benefit to creditors. *In re Cent. Florida Metal Fabrication, Inc.*, 207 B.R. 742, 751 (Bankr. N.D. Fla. 1997) ("While the attorneys should not necessarily be blamed for the lack of management and the lack of success of a Chapter 11 debtor, nor should they be rewarded for stringing a bad case out . . . ."). The Court reduces plan-related fees by 75% to $53,737.50 (a reduction of $161,212.50).

### E. Remaining Categories

The Court allows the requested fees for asset analysis and recovery ($1,700), stay relief and adequate protection ($45,000), and lease assumption/rejection ($6,350) without reduction.

These amounts are reasonable and the services were appropriate to the administration of these cases.

**CONCLUSION**

The Court finds that Gutnicki's requested fees are excessive in the categories identified above for the reasons stated. The reductions are summarized as follows:

| Category | Requested | Allowed |
|---|---:|---:|
| Case Administration | $118,700 | $29,675 |
| Asset Analysis and Recovery | $1,700 | $1,700 |
| Stay Relief / Adequate Protection | $45,000 | $45,000 |
| Lease Assumption/Rejection | $6,350 | $6,350 |
| Contested Matters | $71,050 | $17,762.50 |
| Financing / Cash Collections | $57,200 | $14,300 |
| Claims Administration and Objections | $67,200 | $16,800 |
| Plan and Disclosure Statement | $214,750 | $53,737.50 |
| *Subtotal* | *$581,950* | *$185,325* |
| Expenses | $22,621.62 | $22,621.62 |
| **Total** | **$604,571.62** | **$207,946.62** |

Thus, the Court allows Gutnicki's fees on a final basis in the total amount of $185,325 in fees (a reduction of $396,625)[5] and $22,621.62 in expenses, for a total allowed administrative claim of $207,946.62.

The Court notes, however, that this ruling is academic in a practical sense. These estates are administratively insolvent. There are substantially no assets from which to pay administrative claims. The Debtors arrived in bankruptcy without sufficient cash to make payroll, generated no meaningful post-petition revenue, and exited through dismissal rather than a confirmed plan.

---

[5] This reduction is based on the Court's tally of Gutnicki's time records. The total amount does not include the approximately $5,000 the Court was unable to identify in its examination of Gutnicki's time records.

Gutnicki's allowed fees will join a queue of unpaid administrative claims with no prospect of distribution.

This observation is not intended as criticism of the decision to seek fees. Professionals are entitled to request reasonable compensation for work performed. But it does underscore the Court's broader concern about these cases. These cases were overworked. And resources were devoted, month after month, to a reorganization effort whose fundamental prerequisites (such as tax compliance and positive cash flow) were never met and, on the evidence before the Court, were never realistically achievable.

**IT IS THEREFORE ORDERED** that the Gutnicki Final Fee Application is **GRANTED IN PART** and **DENIED IN PART**, and that Gutnicki LLP is awarded, on a final basis, fees of $185,325 and expenses of $22,621.62, for a total allowed administrative claim of $207,946.62.

Signed on 3/30/2026

*Brenda T. Rhoades*     KC
HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

12